UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                    :

SARAY DOKUM VE MADENI AKSAM SANAYI     :
TURIZM A.S.,                                       :

                                :

                     Plaintiff,       :          17 Civ. 7495 (JPC)

                                :

          -v-                   :         <u>OPINION AND ORDER</u>

                                :

MTS LOGISTICS, INC.,                     :

                                :

                   Defendant.     :

                                :

-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Saray Dokum ve Madeni Aksam Sanayi Turizm A.S. ("Saray") brings this suit against Defendant MTS Logistics Inc. ("MTS") under the United States Carriage of Goods by Sea Act ("COGSA"). Dkt. 73 ("Amended Complaint" or "Amended Compl."). Saray, which purchased 1,534,000 kilograms S-PVC Resin Formosa Formolon 622 (the "Cargo") from a non-party seller, Oxyde Chemicals, Inc. ("Oxyde"), alleges that MTS violated COGSA by failing to deliver the Cargo to the location provided for in bills of lading between Oxyde and MTS. *Id.* ¶¶ 5, 6; *id.* at 5. Saray seeks damages in the amount of $1,321,836. *Id.* ¶ 9.

Now before the Court are MTS's motion for summary judgment, Dkts. 101, 102 ("MTS Motion"), 103, 104, 105, and Saray's cross-motion for summary judgment, Dkts. 108, 109, 110, 111, 113 ("Saray Cross-Motion"). For the reasons stated below, the Court denies both motions.

## I. Background

In early 2017, Saray, a Turkish company, purchased the Cargo from Oxyde, a Texas trading corporation. Dkt. 105 ("MTS Rule 56.1 Statement") ¶¶ 2, 4; Amended Compl. at 4; Dkt. 111, Exhs. 9, 10. Oxyde then contracted with MTS, a New York non-vessel operating common carrier

("NVOCC") to ship the Cargo from Texas to Turkey.  MTS Rule 56.1 Statement ¶¶ 1, 10-11.  An NVOCC "is one who holds [itself] out to provide transportation for hire by water in interstate commerce . . . who assumes or has liability for safe transport."  *Royal & Sun All. Ins., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 140 n.2 (2d Cir. 2010) (quoting 1-1 Saul Sorkin, Goods in Transit § 1.15(8)).  "An NVOCC . . . does not undertake the actual transportation of the cargo," and instead "delivers the shipment to an ocean carrier for transportation."  *Id.* (quoting Sorkin, *supra*, § 1.15(8)).  In other words, "NVOCCs operate as middlemen," as "they arrange for relatively small shipments to be picked up from shippers, consolidate the smaller parcels, and ship them via a carrier or several carriers," but "do not . . . own or charter the ships that actually carry the cargo." *Ins. Co. of N. Am. v. S/S Am. Argosy*, 732 F.2d 299, 301 (2d Cir. 1984).

In February 2017, MTS issued two bills of lading (collectively, the "MTS House B/L") to Oxyde to govern the shipment of the Cargo from Houston, Texas to Istanbul, Turkey.  MTS Rule 56.1 Statement ¶ 5; *see* Dkt. 111 Exh. 1 ("5542 B/L"), Exh. 2 ("5592 B/L"), Exh. 3 ("B/L Terms").  "Bills of ladings are generally issued by carriers, including NVOCCs like MTS . . . ." *MTS Logistics, Inc. v. Innovative Commodities Grp.*, 442 F. Supp. 3d 738, 743 (S.D.N.Y. 2020).  "Bills of lading 'record[] that a carrier has received goods from the party that wishes to ship them, state[] the terms of carriage, and serve[] as evidence of the contract for carriage.'"  *Id.* (first alteration in original) (quoting *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18-19 (2004)).  "In short, they are, 'essentially, contracts.'" *Id.* (quoting *Kirby*, 543 U.S. at 18).  The MTS House B/L lists "Oxyde" as the "shipper," "To Order" as the "consignee," and "Saray" in the "Notify" box.  *See* 5542 B/L

at 1; 5592 B/L at 1.[1]  The MTS House B/L specified the number of "bags" of resin and number of "containers" into which those bags were packed.  *See* 5542 B/L at 1; 5592 B/L at 1.

To actually ship the Cargo, MTS contracted with common carrier Mediterranean Shipping Company S.A. ("MSC").  MSC issued MTS two sea waybills (collectively, the "Ocean B/L," and with the MTS House B/L, the "Bills of Lading"), which governed the shipment.  MTS Rule 56.1 Statement ¶ 12; Dkt. 105, Exh. 4.  A sea waybill is "a contract for the shipment of goods . . . by which the carrier undertakes to deliver the goods to the consignee named in the document," *Herod's Stone Design v. Mediterranean Shipping Co. S.A.*, 434 F. Supp. 3d 142, 148 (S.D.N.Y. 2020) (quoting 1 Admiralty & Mar. Law § 10:11 (6th ed.)), *aff'd*, No. 20-637, 2021 WL 562344 (2d Cir. Feb. 16, 2021), and "typically functions in the same way as a bill of lading, except that it is non-negotiable," *Mitsui Sumitomo Ins. Co. v. Evergreen Marine Corp.*, 621 F.3d 215, 216 n.1 (2d Cir. 2010).  The Ocean B/L lists MTS as the "shipper," "consignee," and "Notify Part[y]." Dkt. 105, Exh. 4 at 2, 6.

Pursuant to the Bills of Lading, an MSC vessel departed Houston, Texas carrying the Cargo.  However, before the vessel arrived in Turkey, U.S. Customs ordered MSC to return the Cargo to its Houston, Texas loading port (the "Redelivery Notices").  MTS Rule 56.1 Statement ¶ 23.[2]  The MSC vessel then returned to Houston with the Cargo, incurring additional freight,

---

[1] "A 'notify party' is 'the party to be notified when the goods arrive at their destination.'" *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 367 n.3 (S.D.N.Y. 2015) (quoting *Dorlan Mgmt. Co. v. M/V MSC DANIELA*, No. 96 Civ. 6747 (JSM), 1997 WL 411930, at *1 n.1 (S.D.N.Y. July 22, 1997), *judgment vacated on reconsideration sub nom. Dorland Mgmt. Inc. v. M/V MSC DANIELA*, 1997 WL 626399 (S.D.N.Y. Oct. 9, 1997)).

[2] Although the parties generally agree that U.S. Customs demanded redelivery of the Cargo because it suspected unlawful transshipment of goods, *see, e.g.*, Dkt. 1 ("Original Compl.") ¶ 11; MTS Rule 56.1 Statement ¶ 25, the reason why U.S. Customs had such a suspicion remains a disputed issue of fact.  Although not entirely clear from its briefs, MTS appears to believe that Saray caused U.S. Customs to issue the Redelivery Notices.  *See* Dkt. 117 ("MTS Opposition") at 14 ("SARAY in this suit, as did Cargo shipper OXYDE in a since discontinued suit, frankly

detention, and demurrage charges (the "Redelivery Charges").  *Id.* ¶ 17.[3]  In June 2017, MSC invoiced MTS approximately $1.4 million to cover the Redelivery Charges.  *Id.*  ¶ 26.  MTS negotiated with MSC to reduce those charges to approximately $760,000, which MTS then paid MSC and thereafter secured possession of the Cargo.  *Id.* ¶ 22.[4]

MTS then informed Oxyde that it intended to foreclose on a lien that it claimed to have over the Cargo by selling it, prompting both Oxyde and Saray to file suit against MTS. Specifically, on July 11, 2017, Saray filed suit in the Southern District of Texas, bringing claims for breach of contract, negligence, and conversion.  Original Compl. ¶¶ 28-42.  As discussed below, this case was later transferred to the Southern District of New York and is the instant action. In the Original Complaint, Saray alleged that it could sue on the MTS House B/L because it was "a 'creditor beneficiary' of the contract between Oxyde and MTS, thus making it a third-party beneficiary."  *Id.* ¶ 31; *see also* Dkt. 124, Exh. B at 18.  Saray also sought a declaratory judgment that MTS did not possess a lien over the Cargo and a Temporary Restraining Order ("TRO") preventing MTS from selling the Cargo.  Original Compl. ¶¶ 15-27; Dkt. 6.  The court heard

---

acknowledged that the Redelivery Notices issued on account of a suspected intended unlawful transshipment by interest parading here as SARAY." (citation omitted)).  Saray, by contrast, appears to attribute the Redelivery Notices to MTS's malfeasance, emphasizing MTS's "prior dealings with shipments not belonging to Saray," which "also raised a red flag with US Customs on three prior occasions." Dkt. 112 ("Saray Counter-Rule 56.1 Statement") ¶ 25; *but see* Dkt. 114 ("MTS Reply") at 4, 5 (calling Saray's statement that MTS was required to return to port three previous times an "egregious falsehood" and "entirely made up" because in one of those instances the ship had not left the port when it was held by U.S. Customs).  Although the parties make much of this in their briefs, the exact relevance of this dispute is not clear.  Regardless, it is not material to the Court's disposition of the motions for summary judgment.

[3] "Demurrage" charges are "liquidated damages owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by the agreed time."  *Demurrage*, Black's Law Dictionary (11th ed. 2019).

[4] Although Saray's Counter-Rule 56.1 statement lists this amount as "$760," Saray Counter-Rule 56.1 Statement ¶ 27, the Court understands from the parties' briefing that the correct amount was $760,000, *see, e.g.*, MTS Rule 56.1 Statement ¶ 27; MTS Motion at 10.

argument on Saray's application for a TRO, and concluded that it would not enjoin MTS from selling the goods unless Saray posted an $820,000 bond by a certain date.  Dkt. 21.[5]  When Saray did not post the bond by the deadline set by the court, the court ordered that MTS "shall sell the Cargo in issue to recover its costs," but noted that "that all rights are reserved for Saray to pursue any and all claims related to a return of the $820,000.00 against MTS or any other party."  Dkt. 23 at 1.  MTS then sold the Cargo, reimbursed itself for the sums previously paid to MSC, and paid Oxyde certain expenses that MTS owed Oxyde.  MTS Rule 56.1 Statement ¶¶ 31, 32.

Around this same time, Oxyde also filed suit in the Southern District of Texas seeking a declaratory judgment that it was not responsible for any detention or demurrage charges pursuant to the terms of the MTS House B/L, which stated that those costs were for the "receiver," and that it was not responsible for any other costs, as title had passed to Saray.  *See Oxyde Chem., Inc. v. MTS Logistics, Inc.*, No. 4:17 Civ. 02004 (GHM) (S.D. Tex.), Dkt. 1.  MTS successfully moved to transfer both cases to the Southern District of New York because of a forum selection clause in the MTS House B/L.  *See* Dkts. 24, 25; *Oxyde Chem., Inc. v. MTS Logistics, Inc.*, No. 17 Civ. 7283 (JMF) (S.D.N.Y.), Dkts. 8, 9.  The parties in *Oxyde Chemicals* voluntarily dismissed that case in November 2017 by stipulation and order.  *Oxyde Chem., Inc. v. MTS Logistics, Inc.*, No. 17 Civ. 7283 (JMF) (S.D.N.Y.), Dkt. 21.

After it was transferred to this District, the present case was originally assigned to the Honorable Paul G. Gardephe.  On January 10, 2019, MTS sought leave to file a motion for summary judgment on the claims in Saray's Original Complaint.  *See* Dkt. 63.  In response, Saray filed a letter contending that MTS's anticipated motion was meritless, that COGSA governed the

---

[5] The Court elected to set the bond at $820,000 to cover the estimated extra storage and freight charges that MTS had incurred since the Cargo returned to Houston.  *See* Dkt. 127, Exh. B at 16-19.

case, and that Saray had raised a *prima facie* case under COGSA.  *See* Dkt. 64.  Saray then submitted its own pre-motion letter stating that it wished to file a motion for summary judgment under COGSA.  *See* Dkt. 66.  Judge Gardephe held a conference on December 12, 2019, during which he expressed his concern that the Amended Complaint contained common law claims but no COGSA claims, and therefore "the basis for [Saray's] proposed summary judgment motion would . . . be based on a statute that isn't mentioned in the complaint."  Dkt. 79 at 3-5.  Although Saray expressed its view that this was permissible, it nonetheless stated that it would move to amend the Original Complaint, and the Court set a briefing schedule.  *Id.* at 11-12.  But on January 9, 2020, pursuant to a court-ordered stipulation of the parties, Saray filed an Amended Complaint that raised a single claim against MTS under COGSA, and dismissed any remaining claims with prejudice.  Dkt. 71; Amended Compl.  On January 27, 2020, MTS filed its Answer with counter-claims for unjust enrichment and legal fees.  Dkt. 74.  The case was then reassigned to the undersigned.  Dkt. 98.

The parties have now cross-moved for summary judgment on the lone COGSA claim in the Amended Complaint.  In its motion for summary judgment, MTS argues that (1) Saray was a stranger to the MTS House B/L and thus lacks standing to bring this suit; (2) COGSA does not apply because the Cargo was not "damaged" or "lost"; (3) MTS acted properly when it sold the Cargo to pay the Redelivery Charges; and (4) if COGSA does apply, it limits Saray's ability to recover to $500 per container.  *See* MTS Motion.[6]  In its cross-motion for summary judgment, Saray asserts that it has established a *prima facie* case under COGSA and that MTS has raised no

---

[6] MTS does not mention its unjust enrichment and legal fees counter-claims in its motion for summary judgment.

valid defenses.  *See* Saray Cross-Motion.  The Court held oral argument on the motions on February 11, 2021.  *See* Dkt. 125 ("2/11/21 Tr.").

## II.  Legal Standard

A court should only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a genuine dispute of material fact exists, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact on each material element of the claims asserted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If the moving party carries her burden, the non-moving party must then "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).  "On cross-motions for summary judgment, each moving party 'has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor.'" *McDonnell v. First Unum Life Ins. Co*., No. 10 Civ. 8140 (RPP), 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013) (quoting *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988)).  A court must grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

## III.  Discussion

Notwithstanding this case's long history, Plaintiff's Amended Complaint pleads only a single claim: a violation of COGSA.  COGSA is "the culmination of a multilateral effort to

establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade.'" *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 537 (1995) (internal quotation marks omitted). "COGSA establishes rules that overlay bills of lading between carriers and their identifiable contracting partners—usually suppliers and consignors . . . ." *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 70 (S.D.N.Y. 2009), *opinion adhered to on reconsideration*, 643 F. Supp. 2d 553 (S.D.N.Y. 2009), *and aff'd sub nom. Chem One, Ltd. v. M/V RICKMERS GENOA*, 502 F. App'x 66 (2d Cir. 2012).

COGSA requires that a carrier properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried. 46 U.S.C. § 30701 note, § 3(2).[7] To establish a *prima facie* case under COGSA, "a consignee or shipper . . . bears the initial burden of proving both delivery of the goods to the carrier . . . in good condition, and outturn by the carrier or by the stevedore, for whose conduct the carrier is responsible, in damaged condition." *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d Cir. 1977); *see also Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351-52 (2d Cir. 1981) ("[P]laintiff has the burden, which remains with it throughout the case, of proving that 'the goods were damaged while in the carrier's custody.'" (quoting *Pan-American Hide Co. v. Nippon Yusen (Kabushiki), Kaisha*, 13 F.2d 871 (S.D.N.Y. 1921) (L. Hand, *J.*))). "If plaintiff . . . establishes a *prima facie* case for recovery," it will "be entitled to prevail unless the carrier brings itself within one of the exceptions" for defenses to liability set forth in the statute. *Caemint Food, Inc.*, 647 F.2d at 352. For instance, the carrier shall not be responsible for "loss or damage arising or resulting from," among other things, "[a]rrest or restraint of princes, rulers, or

---

[7] COGSA was previously codified at 46 U.S.C. App. §§ 1300-1315. "Congress has since 'reorganiz[ed] and restat[ed] the laws . . . in the appendix to title 46, and COGSA's provisions have been recodified at 46 U.S.C. § 30701 note." *Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.*, 547 F.3d 351, 354 n.2 (2d Cir. 2008) (alteration in original) (quoting Act of Oct. 6, 2006, Pub. L. No. 109–304, 120 Stat. 1485).

people, or seizure under legal process" or an "[a]ct or omission of the shipper or owner of the goods, his agent or representative."  46 U.S.C. § 30701 note, § 4(2).

### A.  The Amended Complaint Relates Back to the Original Complaint

Before addressing the claims on the merits, the Court first considers MTS's argument—set forth only in its opposition to Saray's cross-motion and not once mentioned in its own motion for summary judgment—that the Amended Complaint does not relate back to the Original Complaint and therefore is time-barred under COGSA's one-year statute of limitations.  *See* MTS Opposition at 6-9.  COGSA requires that an individual or entity sue within one year of the delivery of the goods or the date when the goods should have been delivered, so long as there is notice of loss or damage.  *See* 46 U.S.C. § 30701 note, § 3(6) ("In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered: *Provided*, That if a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.").  Although Saray filed its Original Complaint in the Southern District of Texas within the one-year limitations period provided for under the statute, it did not raise its COGSA claim until its Amended Complaint, filed after that period.

Rule 15(c) of the Federal Rules of Civil Procedure provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  "The purpose of Rule 15(c)'s relation-back provision is 'to balance the interests of the defendant protected by the statute of limitations

with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits.'" *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc*., 916 F.3d 116, 128 (2d Cir. 2019) (quoting *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 550 (2010)).  "[T]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading."  *Slayton v. Am. Express Co*., 460 F.3d 215, 228 (2d Cir. 2006) (internal quotation marks omitted).

Saray's statute of limitations argument is unavailing, as the COGSA claim in the Amended Complaint clearly relates back to the claims in the Original Complaint.  Although in arguing that the COGSA claim does not relate back, MTS impugns Saray's motives in filing the Amended Complaint, calling the Original Complaint a "calculated endeavor," MTS Opposition at 8, and Saray's decision to file the Amended Complaint "a gambit reeking of opportunism and gamesmanship," *id.* at 7, it does not—and cannot seriously—contend that the Amended Complaint fails to "assert[] a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B); *see Lehman XS Tr.*, 916 F.3d at 128. While Saray may have adopted a new legal theory in the Amended Complaint by exclusively relying on COGSA, both the Original Complaint and Amended Complaint plainly concern the same set of facts: the intended shipment of the Cargo from Houston, Texas to Istanbul, Turkey, and MTS's failure to deliver the Cargo.

None of the cases MTS cites in its opposition suggest otherwise.  *See* MTS Opposition at 8-9.  For instance, in *In re Rationis Enterprises, Inc. of Panama*, 45 F. Supp. 2d 365, 367 (S.D.N.Y. 1999), the plaintiff sought to amend its claim "to add additional cargo carried aboard the same vessel, during the same voyage, lost in the same incident," but that additional cargo was shipped

pursuant to an entirely different bill of lading from the one that was the basis the plaintiff's initial suit. The court found that the amendment did not relate back, as "[e]ach bill of lading is a separate transaction." *Id.* Here, by contrast, although Saray has shifted its theory of liability in the Amended Complaint to one solely under COGSA, both complaints clearly concern the same transaction and the same bills of lading. *Compare* Original Compl. ¶ 7 *with* Amended Compl. ¶¶ 3-5.

In sum, Saray's Amended Complaint, entered pursuant to a stipulation between the parties, clearly relates back to its Original Complaint.[8] The Court therefore concludes that Saray's COGSA claim is not barred by the statute's one-year limitations period, and proceeds to assess it on the merits.

### B. Whether Saray Can Sue on the Bill of Lading Remains a Material Issue of Fact

Although Saray's COGSA claim was timely, Saray's ability to raise a COGSA claim stands on less secure footing, and Saray's exact theory of why it can sue has changed with the tide. In pleading breach of contract in its Original Complaint, Saray described itself as "a 'creditor beneficiary' of the contract between Oxyde and MTS," and thus "a third-party beneficiary" that "can enforce the terms of the contract." Original Compl. ¶¶ 31-32.[9] Then, in its Amended

---

[8] Because the Court rules that the Amended Complaint relates back to the Original Complaint, the Court does not consider whether MTS waived its statute of limitations defense by failing to raise it in its Answer, *see* Fed. R. Civ. P. 8(c); *Kropelnicki v. Siegel*, 290 F.3d 118, 130 n.7 (2d Cir. 2002) ("The statute of limitations is an affirmative defense that is waived if not raised."), or whether, as Saray argues, MTS's consent to file the Amended Complaint was an admission that the COGSA claim was timely, *see* 2/11/21 Tr. 44-45.

[9] The Restatement (Second) of Contracts states that one way to be an intended beneficiary is "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties" and "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary." Restatement (Second) of Contracts § 302(1)(a) (1981). This is "often referred to as a 'creditor beneficiary.'" *Id.* § 302 cmt. b. "In such cases the promisee is surety for the promisor, the promise is an asset of the promisee, and a direct action by beneficiary against promisor is normally appropriate to carry out the intention of promisor and promisee, even

Complaint, which is the operative complaint before the Court and again only alleges a COGSA violation, Saray states that it "was the consignee, owner, or underwriter of the shipment described in Schedule 'B' [the schedule for the Bills of Lading], and brings this action on its own behalf and as agent and trustee, on behalf of and for the interest of all parties who may be or become interested in the said shipments, as their respective interests may ultimately appear."  Amended Compl. ¶ 7. In its cross-motion for summary judgment, Saray asserts that a "shipper or consignee" can raise a *prima facie* case, *see* Saray Cross-Motion at 5-6, and thus it presumably—but not explicitly—is relying on a theory that it was a shipper or consignee for the purposes of that motion.  Then, after MTS argued both in its motion for summary judgment and in opposing Saray's cross-motion that Saray was a stranger to the Bills of Lading, *see* MTS Motion at 14-20; MTS Opposition at 12-14, Saray asserted that it was "a party" to the Bills of Lading, *see* Dkt. 107 ("Saray Opposition") at 3-7; Dkt. 120 ("Saray Reply") at 4-7.  In support of that argument, Saray looks primarily to the so-called Merchant Clause in the MTS House B/L, which purports to hold any "merchants" "jointly and severally liable to the Carrier for the payment of all Charges, and for the performance of the obligations of any of them under this Bill of Lading."  B/L Terms at 1.  The Merchant Clause defines a "merchant" as "the shipper, consignee, receiver, holder of this Bill of Lading, owner of the cargo or person entitled to the possession of the cargo and the servants and agents of any of these."  *Id.*  Saray also points to e-mails from M. Can Fidan, Vice President of MTS, in which Saray contends that Fidan "admitted that Saray was the consignee and owner of the [C]argo." Saray Reply at 6-7; *see also* Saray Opposition at 5-7.  Finally, at oral argument, Saray switched course yet again, arguing that it could bring suit under COGSA on the basis that it was a third-

---

though no intention is manifested to give the beneficiary the benefit of the promised performance." *Id.*

party beneficiary to the Bills of Lading, albeit seemingly not based on the "creditor beneficiary" theory it had raised in the Original Complaint.  *See* 2/11/21 Tr. at 6-7.

### 1.  Saray Did Not Properly Raise Its Third-Party Beneficiary Theory

The Court begins with Saray's most recent theory: that it was a third-party beneficiary to the Bills of Lading.  Again, while Saray had claimed to be a creditor beneficiary in its Original Complaint, *see* Original Compl. ¶ 31, that theory is notably absent from the Amended Complaint and from *any* briefing either in support of its cross-motion for summary judgment or in opposition to MTS's motion for summary judgment.[10]  During oral argument, Saray essentially acknowledged that it had failed to articulate this theory previously.  *See, e.g.*, 2/11/21 Tr. at 6 ("We certainly are claiming to be an intended third-party beneficiary.  I mean, I think that is – while maybe not stated in the complaint, it's apparent on its face, what other capacity would we have to bring suit at all?"); *id.* at 16 ("So, long story short, your Honor, we didn't explicitly set forth that we are intended third-party beneficiary, but I think the facts and the existing case law in the circuit can dictate that what else could we be?").[11]

It should go without saying that a party in federal court, unless proceeding *pro se*, must articulate the legal basis for its claims, and should not put it upon the Court to divine its legal theories.  *See, e.g.*, *McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005) ("We think it reasonable to hold appellate counsel to a standard that obliges a lawyer to include his most cogent arguments

---

[10] In fact, Saray's counsel sought to distance itself from the Original Complaint, stating at a December 12, 2019 conference before Judge Gardephe that Saray's previous counsel, who filed the Original Complaint, "[d]idn't have familiarity with these types of claims."  Dkt. 79 at 7.

[11] At the end of oral argument, the Court gave the parties the opportunity to brief the third-party beneficiary issue.  2/11/21 Tr. at 45.  In its supplemental briefing, Saray attempted to articulate a basis for its ability to bring this suit as a third-party beneficiary, but did not address how it had properly raised that theory.  *See* Dkt. 123.

in his opening brief, upon pain of otherwise finding them waived."); *cf. Wenzhou Wanli Food Co. v. Hop Chong Trading Co., Inc.*, No. 98 Civ. 5045 (JFK), 2000 WL 964944, at *3 (S.D.N.Y. July 11, 2000) (commenting that failing to cite "statutes or case law supporting [a] motion for summary judgment . . . 'effectively places on the court the burden of conducting the initial legal analysis that is properly the responsibility of . . . counsel'" (quoting *Rotblut v. 300 E. 74th St. Owners Corp.*, No. 96 Civ. 5762 (JSM) (MHD), 1997 WL 16063, at *1 (S.D.N.Y. Jan. 16, 1997)). Courts regularly reject a party's attempt to raise a new claim or theory in opposition to a dispositive motion, such as a motion to dismiss or a motion for summary judgment. *See, e.g.*, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (declining to consider an argument based on an alleged duty that "does not appear anywhere in the amended complaint and did not enter the case until [the plaintiff] mentioned it for the first time in her opposition memoranda to the motion to dismiss"); *Stapleton v. Pavilion Bldg. Installation Sys., Ltd.*, No. 09 Civ. 934S (WMS), 2017 WL 431801, at *4 (W.D.N.Y. Feb. 1, 2017) (rejecting a claim where the plaintiff "argue[d] in its opposition papers that it is the third-party beneficiary" of certain contracts because that was a "new theory of liability, one which is entirely absent from the Amended Complaint"), *aff'd sub nom. Stapleton v. Barrett Crane Design & Eng'g*, 725 F. App'x 28 (2d Cir. 2018). Here, Saray did not even raise its third-party beneficiary theory in its opposition papers: It waited until oral argument. Courts are loath to accept such belated arguments. *See, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725 (LGS), 2015 WL 997699, at *3 (S.D.N.Y. Mar. 5, 2015) (concluding that the court need not consider the plaintiff's theory raised for the first time at oral argument because it was both "unwarranted and unfair to [d]efendant, which had no advance notice of [p]laintiff's new argument and no opportunity to brief its opposition"); *Fingerhut by Fingerhut v. Chautauqua Inst. Corp.*, No. 07 Civ. 502, 2018 WL 2091461, at *3 (W.D.N.Y. May 3, 2018) ("[T]his Court

refused to consider the new claim at oral argument of the summary judgment motion, a refusal that was well within this Court's discretion.").   The Court therefore rejects Saray's third-party beneficiary theory on this basis alone.

### 2. Saray Has Not Set Forth Any Facts Supporting Whether It Is a Third-Party Beneficiary

But even if the Court were to exercise its discretion in considering Saray's new theory of liability, the Court would nonetheless conclude that Saray has not raised a *prima facie* case of liability under COGSA based on a third-party beneficiary theory, as it has not supported such a theory with any facts that raise a genuine issue for trial.

During oral argument, Saray relied heavily upon the 2009 decision by the Honorable Loretta A. Preska of this District in *In re M/V Rickmers Genoa Litigation*, 622 F. Supp. 2d 56.   *See* 2/11/21 Tr. at 9-11, 16-17, 23-29, 41-43.   At issue in *Rickmers* was "the extent of a cargo buyer's liability in the context of maritime disaster litigation."   622 F. Supp. 2d at 58.   The defendant, ESM Group, purchased a chemical agent from a subsidiary, and the subsidiary arranged to have the chemical agent transported to ESM Group.   *Id.* at 61-62.   However, the chemical agent exploded during its maritime voyage, damaging the ship and other cargo aboard.   *Id.* at 58-59.   Although ESM Group was not a party to the bills of lading governing the voyage, the shipowners and other entities that owned or insured the other cargo on the ship sued ESM Group for damages, bringing claims "based in common law negligence, common law strict liability, [COGSA], breach of contract, and alter-ego theories of liability."   *Id.*

Two portions of the court's opinion are particularly relevant here.   First, the court assessed the plaintiffs' claim that ESM Group could be liable under sections 4(3) and 4(6) of COGSA.   *See id.* at 67-70; 46 U.S.C. § 30701 note, § 4(3), (6).   According to section 4(3), a "shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any

cause without the act, fault, or neglect of the shipper, his agents, or his servants."  36 U.S.C.

§ 30701 note, § 4(3).  Section 4(6), however, provides that:

> Goods of an inflammable, explosive, or dangerous nature to the shipment whereof the carrier, master or agent of the carrier, has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place or destroyed or rendered innocuous by the carrier without compensation, and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment.

*Id.* § 30701 note, § 4(6).  The plaintiffs sought to wield these provisions against ESM Group on

the basis that ESM Group, as a third-party buyer of the goods, was a "shipper" under COGSA, and

therefore was liable for all damages arising from its shipment of explosive goods.  *See In re M/V*

*Rickmers Genoa Litig.*, 622 F. Supp. 2d at 67.

The court rejected this theory, noting that COGSA did not define "shipper," but a "plain

language interpretation of the term" reflected that "a COGSA shipper is whomever the carrier

contracted with, as evidenced by their bill of lading."  *Id.* at 68.  In reaching its holding, the court

declined the plaintiffs' invitation to adopt the broader definition of "shipper" from the Shipping

Act of 1984 (the "Shipping Act"), 46 U.S.C. §§ 40101-41309, which ostensibly would have

included ESM Group.  The court reasoned that the Shipping Act "limits the applicability of its

definitions elsewhere" and is a "fundamentally regulatory regime" that "is not meant to affect

maritime parties' rights and liabilities for purposes of civil litigation," *In re M/V Rickmers Genoa*

*Litig.*, 622 F. Supp. 2d at 68-69, whereas COGSA "*does* affect maritime parties' rights and

liabilities for purposes of civil litigation" and "is fundamentally concerned with efficiently and

equitably allocating the contractual rights and obligations of carriers and shippers who have

actually contracted with each other," *id.* at 70.

The second relevant portion of the opinion is the court's analysis of the plaintiffs' breach

of contract claim against ESM Group.  *See id.* at 70-73.  For this claim, the plaintiffs argued that

ESM Group, as the buyer, was a merchant bound by the bills of lading's Merchant Clauses, which were virtually identical to the one in this case. *Id.* at 71. The court first determined that the plaintiffs' breach of contract claim was controlled by federal maritime common law, and accordingly "look[ed] to common law principles of contract formation and interpretation to determine whether ESM Group was bound by the bills of lading": A third-party beneficiary may generally enforce a contract in its favor, but is not bound by a contract unless there is a showing "that the third party exhibited acceptance to be so bound" or had "an agency relationship with one of the contracting parties." *Id.* at 71-72. Applying these principles, the court concluded that there was no evidence ESM Group intended to be bound such that the plaintiffs could enforce the bills of lading's terms against it. *Id.* at 72-73.

The parties hotly contest the import of *Rickmers*. During oral argument, Saray contended that under the court's third-party beneficiary analysis, it could sue under COGSA, *see, e.g.*, 2/11/21 Tr. at 9, 11, whereas MTS countered that the court "specifically held" that "a third party who is not a party to the bill of lading could not sue under COGSA," *id.* at 23. In supplemental submissions filed after oral argument regarding the third-party beneficiary issue, Saray continues to primarily rely on *Rickmers*, arguing that Saray was an intended beneficiary because it purchased the Cargo from Oxyde and demonstrated that it intended to be bound by the bill of lading by filing suit under it. *See* Dkt. 123 at 2-3. In its response, MTS argues, among other things, that Saray was not a party to the contract nor the intended beneficiary, as it was listed only as the "notify"

party, and it purchased the Cargo under a contract with a CIF, or "cost, freight, and insurance," term. Dkt. 124.[12]

As an initial matter, the parties' diametrical views of *Rickmers* appears to be due to their reliance on two distinct holdings of that opinion. While Saray depicts the "relevant issue" of the *Rickmers* decision as "whether defendant ESM Group, a non-party to a bill of lading who, like Saray, . . . was listed as the notify party on the bill of lading, *could be held liable under COGSA* for the transport of hazardous cargo," Dkt. 123 at 1 (emphasis added), the portion of the *Rickmers* opinion upon which it relies was not about a claim directly under COGSA, but rather an assessment of the plaintiffs' breach of contract claim under federal maritime common law, *see In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d at 72. MTS, for its part, seemingly relies upon the court's assessment of the plaintiffs' section 4 claims and the court's decision that a third-party buyer is not a "shipper" under COGSA. But neither of those portions of *Rickmers* actually addresses the issue before this Court, *i.e.*, whether a third-party buyer can raise a COGSA claim.

The Second Circuit has "not yet determined whether third parties may bring claims under COGSA." *In re M/V DG HARMONY*, 533 F.3d 83, 93 (2d Cir. 2008); *see also Chem One, Ltd.*, 502 F. App'x at 70 n.4 ("Because we conclude that Chem One's COGSA claims fail on the merits, we need not here decide whether such a third party, *i.e.*, a party other than a carrier or agent of the carrier, can maintain a COGSA action against the shipper."). Nor is it clear from the face of the statute, which does not mention the rights of third-party beneficiaries. In fact, COGSA speaks

---

[12] CIF "is a trade term which means that '[t]he seller is responsible for paying the cost, freight and insurance coverage necessary to bring the goods to the named port of destination.'" *Italverde Trading, Inc. v. Four Bills of Lading Numbered LRNNN 120950, LRNNN 122950, LRNN 123580, MSLNV 254064*, 485 F. Supp. 2d 187, 199 (E.D.N.Y. 2007) (quoting *St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support*, No. 00 Civ. 9344 (SHS), 2002 WL 465312, at *4 (S.D.N.Y. Mar. 26, 2002), *aff'd*, 53 F. App'x 173 (2d Cir. 2002)). The relevance of this term is discussed in Section II.2.C, *infra*.

only of the limits of the "the *right of the shipper to bring suit* within one year after the delivery of the goods or the date when the goods should have been delivered."  *See* 46 U.S.C. § 30701 note, § 3(6) (emphasis added).  Moreover, COGSA was designed to "establish uniform ocean bills of lading to govern the rights and *liabilities of carriers and shippers* inter se in international trade," *Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 301 (1959) (emphasis added), and codified "rules that overlay bills of lading between carriers *and their identifiable contracting partners*—usually suppliers and consignors, as the plain meaning of the term 'shipper' suggests," *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d at 70.  Although Saray's counsel suggested that it brings this sort of claim often, *see* 2/11/21 Tr. at 14-15, Saray has not cited to a single case where a third party has successfully brought a COGSA claim.

In assessing whether such a claim is appropriate, the Court considers the unique nature of a COGSA claim:  An "action under COGSA is a maritime action in the nature of a mixed tort, contract and bailment cause of action." *Texport Oil Co. v. M/V Amolyntos*, 11 F.3d 361, 367 (2d Cir. 1993) (citation and internal quotation marks omitted), *overruled on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995); *see also Rationis Enters. Inc. of Pen. v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 587 n.3 (2d Cir. 2005) (reaffirming *Texport Oil Co.*); *Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co.*, 215 F.3d 1217, 1220-21 (11th Cir. 2000) (concluding that COGSA provides a "hybrid[]" claim "born of elements from contract and tort"). In other words, a "COGSA claim against a negligent carrier for lost or damaged goods comprises elements of both contract, arising from the breach of the contract of carriage, and tort, issuing from the breach of the carrier's duty of care." *Polo Ralph Lauren, L.P.*, 215 F.3d at 1221.

Although it is generally true that "where a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle

will apply except when a statutory purpose to the contrary is evident," *Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings*, 268 F.3d 103, 127 (2d Cir. 2001) (internal quotation marks omitted), the Second Circuit has held that not all federal maritime common law was incorporated into COGSA, *see, e.g.*, *Senator Linie Gmbh & Co. Kg v. Sunway Line, Inc*., 291 F.3d 145, 165-66 (2d Cir. 2002) (concluding that then-section 1304(6) of COGSA, now codified at 46 U.S.C. § 30701 note, § 6, did not "codify preexisting maritime common law regarding liability for shippers of inherently dangerous goods," and instead "displace[d] otherwise inconsistent maritime common law").  Although the parties have not pointed to any cases that have applied third-party beneficiary principles to a COGSA claim, the Court assumes, without deciding, that COGSA incorporated well-established federal maritime common law third-party beneficiary principles into its burden-shifting framework.  The Court therefore assumes that a third-party beneficiary can bring a claim under COGSA.

Under the Restatement (Second) of Contracts, which is commonly used in assessing third-party liability in maritime contract cases, *see, e.g.*, *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d at 72; *see also Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423, 428 (1959), a party is an "intended beneficiary" "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties" and (a) "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or (b) "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) of Contracts § 302(1) (1981).  By contrast, the Restatement distinguishes an "incidental beneficiary" as "a beneficiary who is not an intended beneficiary."  *Id.* § 302(2).

Saray has not set forth any facts that would create an issue of material fact regarding its status as an intended beneficiary.  Initially, the Amended Complaint is devoid of any facts

20

supporting Saray's third-party beneficiary theory.  The Amended Complaint states only that Saray "was the consignee, owner, or underwriter of the shipment . . . , and brings this action on its own behalf and as agent and trustee, on behalf of and for the interest of all parties who may be or become interested in the said shipments, as their respective interests may ultimately appear, and Plaintiff is entitled to maintain this action."  Amended Compl. ¶ 7.  This conclusory statement does not include any facts regarding the contracting parties' intent to benefit Saray.  *See Brown v. AXA RE*, No. 02 Civ. 10138 (LTS) (AJ), 2004 WL 941959, at *4 (S.D.N.Y. May 3, 2004) (dismissing a claim because "[p]ursuant to section 302(1)(b) of the Restatement (Second) of Contracts, the circumstances surrounding the contract must indicate that the promisee intends to give the beneficiary the benefit of the promised performance," and the plaintiffs had "failed to allege any facts at all regarding the intentions of the promisee" (emphasis omitted)).  And because Saray failed to mention its third-party beneficiary theory in its cross-motion for summary judgment, the Court is unable to deduce what facts in that briefing Saray contends support its status as an intended beneficiary.

In its post-argument letter, Saray contends that "[t]he benefit to Saray is apparent," and it "had the reasonable expectation" that it would receive the Cargo because (1) MTS and Oxyde contracted to deliver the resin "to Order," "i.e., to whomever Oxyde instructed MTS to deliver the cargo," and that (2) the "to Order" party was Saray.  Dkt. 123 at 2.  In other words, Saray appears to argue that its status as a buyer makes it an intended beneficiary.  But this alone is insufficient.  *See Kanematsu-Goshu Ltd. v. M/T Messiniaki Aigli*, No. 83 Civ. 530 (CBM), 1986 WL 751, at *5 n.3 (S.D.N.Y. Jan. 8, 1986) ("Plaintiff's apparent claim against [defendant] based on the contract between [defendant] and [a third party] and an alleged third party beneficiary relationship between [the third party] and plaintiff is clearly without merit since plaintiff has offered no evidence that it

was anything more, as a remote buyer, than an incidental beneficiary of this contract."). While Saray relies on the "to Order" clause, which made the MTS House B/L a negotiable instrument, *see, e.g.*, *Porky Prod., Inc. v. Nippon Exp. U.S.A. (Illinois), Inc.*, 1 F. Supp. 2d 227, 232 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998), it has not explained how that provision demonstrates the parties' intent to benefit Saray. And while Saray contends that it "had a reasonable expectation" that it would get the Cargo, it does not explain why that is dispositive. Nor is it apparent to the Court, as the relevant inquiry is the intent of the promisee, not the expectation of the third party.

Saray does not point to anything else in the MTS House B/L that reflects any intent to benefit Saray. "[C]ontracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Kirby*, 543 U.S. at 31. Here, Saray is listed only as a "notify" party. During argument, Saray admitted that it was unaware of a single case in which a "notify" party was permitted to raise a COGSA claim, *see* 2/11/21 Tr. at 16, and case law confirms that a "notify" status generally confers no rights upon a party, *see, e.g.*, *Columbia Trading Corp. v. Moore-McCormack Lines, Inc.*, 374 F.2d 864, 865 (2d Cir. 1967) ("The fact that Mattaldi was listed in the bill of lading as the party to be notified raises no presumption that he was the intended consignee."); *9178-6103 Quibec Inc. v. Unitrans-Pra Co.*, No. 09 Civ. 144 (MDG), 2018 WL 5084820, at *7 n.8 (E.D.N.Y. Oct. 17, 2018) ("However, simply being the party for notification is not sufficient to establish ownership or title to the vehicle."); *see also* 49 U.S.C. § 80103(a)(2) ("Inserting in a negotiable bill of lading the name of a person to be notified of the arrival of the goods – (A) does not limit its negotiability; and (B) is not notice to the purchaser of the goods of a right the named person has to the goods."). Oxyde and MTS could have listed Saray in the "consignee" box, which might have given Saray a right to sue on the

contract.  *See, e.g.*, *Flying Phoenix Corp. v. Creative Packaging Mach., Inc.*, 681 F.3d 1198, 1199-

1200 (10th Cir. 2012) (considering a buyer listed as a "consignee" as a third-party beneficiary);

*accord CMA CGM (Am.) L.L.C. v. Seafood Expert W. Inc.*, No. 13 Civ. 2839 (VSB), 2015 WL

1564996, at *7 (S.D.N.Y. Mar. 31, 2015); *Siderius, Inc. v. M.V. Ida Prima*, 613 F. Supp. 916, 921

(S.D.N.Y. 1985).  But Oxyde and MTS did not do so.

        The brunt of Saray's post-argument letter focuses not on whether it was an incidental or

intended beneficiary, but rather whether it "exhibited acceptance to be" bound by the MTS House

B/L.  *See* Dkt. 123 at 3 (quoting *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d at 72).  But

exhibiting acceptance alone does not make Saray an intended beneficiary.  In other words, the

cases cited by Saray serve only to support the conclusion that if an intended beneficiary can sue

on the contract and files suit, it thereby accepts the terms and limitations set forth in the bill of

lading.  *See, e.g.*, *Taisheng Int'l Ltd. v. Eagle Mar. Servs., Inc.*, No. Civ.A. H-05-1920, 2006 WL

846380, at *3 (S.D. Tex. Mar. 30, 2006) ("Courts have bound non-signatory consignees to bills of

lading under the acceptance theory.  By filing a lawsuit under a bill of lading, the consignee accepts

its terms, including an arbitration or choice of law clause."); *Anchor Seafood, Inc. v. CMA-CGB

(Caribbean), Inc.*, No. 05 Civ. 23097, 2005 WL 4674292, at *2 (S.D. Fla. May 4, 2005) ("By filing

a lawsuit against carrier CMA CMG for cargo damages under the bill of lading, Anchor, a named

consignee, is subject to the forum selection clause providing for jurisdiction exclusively in the

courts of Marseille, France.").  That is why, for instance, when Saray filed suit in Texas, Saray

was bound by the forum selection clause in the MTS House B/L that required this case to be heard

in this District.  But these cases do not support the proposition that a third party, exclusively

because it has purchased goods, necessarily has a *right to recovery* under a contract for the

shipment of those goods.  To hold otherwise would be to allow any party with any interest in

property to sue on a bill of lading and recover so long as they accepted the bill of lading's terms—essentially eviscerating the distinction between an incidental and an intended beneficiary. *See* Restatement (Second) of Contracts § 302(1) (1981).

In sum, while the Court finds Saray's failure to articulate its third-party beneficiary theory at any point between filing the Amended Complaint and oral argument sufficient reason alone to reject this theory, the Court concludes that even if it were to consider this argument, Saray has nonetheless failed to put forth any facts that would allow a reasonable fact-finder to conclude that it was an intended third-party beneficiary.

### C.   Whether Saray Is a Merchant Remains a Disputed Issue of Fact

Notwithstanding the above, Saray's second-most recent theory—that it was a merchant under the MTS House B/L—does carry more persuasive weight.  As discussed above, the MTS House B/L has a so-called "Merchant Clause" that defines a "merchant" as "the shipper, consignee, receiver, holder of this Bill of Lading, owner of the cargo or person entitled to the possession of the cargo and the servants and agents of any of these."  B/L Terms at 1.  This clause further provides that any "merchant" "shall be jointly and severally liable to the Carrier for the payment of all Charges, and for the performance of the obligations of any of them under this Bill of Lading." *Id.*

Although Saray does not point to any cases in which a merchant sued on a bill of lading, a review of the case law reveals that at least two other circuits have concluded that an entity that falls under a Merchant Clause can sue on a bill of lading.  First, in *All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu*, the Ninth Circuit assessed a similar Merchant Clause to the one at issue here, which sought to bind the "shipper, consignor, consignee, owner and receiver of the Goods and the Holder of this Bill of Lading." 7 F.3d 1427, 1432 (9th Cir. 1993).  The Ninth Circuit noted

that the bills of lading in that case had spaces for the shipper, exporter, consignee, notify parties, forwarding agent references, and the vessel, but no space for the merchant or owner of the goods, despite mentioning the term merchant "approximately seventy-seven times." *Id.* The court concluded that the Merchant Clause "unambiguously provides that the cargo owner has obligations under the bills of lading," and therefore "the owners of the goods are parties to the bills of lading as Merchants and therefore have an in personam claim against" the carrier. *Id.* The court further emphasized that even if it were "to view the definition of Merchant as an ambiguous contract term, [it] would construe this ambiguity against the carrier under the rules of construction applicable to bills of lading," which are to be strictly construed against the carrier given that they are contracts of adhesion. *Id.* at 1431-32.

The Eleventh Circuit in *Polo Ralph Lauren, L.P. v. Tropical Shipping & Construction Company* also addressed "what recourse, if any, an owner of goods lost at sea has against the carrier when the owner of the goods is not a named party to the bill of lading," 215 F.3d at 1219, and reached a similar conclusion as the Ninth Circuit. Highlighting *All Pacific Trading*'s "persuasive" reasoning, the Eleventh Circuit explained that the bills of lading at issue "recurrently refer to the 'owner of the goods' and specifically bind the 'owner of the goods' to its terms and obligations, creating the possibility that Polo," which claimed to be the owner of the goods, "would have standing to sue as owner of the goods or as a third-party beneficiary to the bills of lading." *Id.* at 1223. But because it found the record "regrettably sparse," the Eleventh Circuit reversed the district court's grant of summary judgment and remanded on the issue of whether Polo was in fact the owner of the goods at issue. *Id.* at 1223.[13]

---

[13] The court in *Rickmers* cited these two cases for the proposition that "[s]ome courts have held that when a third-party who falls within a Merchant Clause sues on a bill of lading, the third-party in effect accepts the bill of lading and becomes a party to the contract," as opposed to other

The Court finds these cases persuasive.  MTS, as the NVOCC, elected to include a broad Merchant Clause, and in doing so intended to bind the "owner" and "person entitled to possession" of the Cargo.  *Cf. Kirby*, 543 U.S. at 31 ("The plain language of the [contractual clause at issue] indicates an intent to extend the liability limitation broadly—to '*any* servant, agent or other person (including *any* independent contractor)' whose services contribute to performing the contract.'" (citation omitted)).  And as in *All Pacific Trading*, the MTS House B/L repeatedly referred to a "merchant," yet provided no space to name the owner or person entitled to possession of the Cargo.  In light of this, the MTS House B/L gave the owner or person entitled to the goods a right to sue under it.

Nonetheless, although the Court concludes that a "merchant" can sue under the MTS House B/L, Saray has not provided evidence that would allow the Court to conclude that it was in fact a "merchant" as a matter of law.  In arguing that it was a "merchant," Saray broadly states that it was "at all times the holder of the MTS negotiable bills of lading, was the purchaser of the Cargo, was the 'person' entitled to possession of the Cargo and, had the Cargo actually arrived in Turkey, Saray would have presented the signed bills of lading."  Saray Opposition at 4.[14]  In support, Saray hinges much of its argument on e-mails from M. Can. Fidan, MTS's Vice President, who Saray

---

cases in which the courts "have been more circumspect with their terminology and hew more closely to third-party beneficiary principles."  622 F. Supp. 2d at 72 (citing *EIMSKIP v. Atl. Fish Mkt., Inc.*, 417 F.3d 72, 78 (1st Cir. 2005)).  Although the court in *Rickmers* elected to "follow the general contract rules," *id.*, this Court does not find any tension between its holding here and *Rickmers*.  Again, at issue in *Rickmers* was whether a merchant could be bound by a Merchant Clause, not whether a Merchant Clause could give a "merchant" standing to sue under COGSA.

[14] In support, Saray cited *Hirsch v. Citibank, N.A.*, 542 F. App'x 35, 37 (2d Cir. 2013) for the proposition that "'receipt of a physical document containing contract terms or notice thereof is frequently deemed, in the world of paper transactions, a sufficient circumstance to place the offeree on' notice."  Saray Opposition at 4.  But while *Hirsch* may support the proposition that Saray, if it was the holder of the MTS House B/L, was on notice of the terms of that bill of lading, it is not clear how this makes Saray a merchant under the MTS House B/L when the parties dispute whether Saray was in fact the holder of the MTS House B/L.

contends "admitted that Saray was the consignee and owner of the cargo."  Saray Reply at 6; *see also* Saray Opposition at 5; Saray Counter-Rule 56.1 Statement ¶ 17.  Saray points to two e-mails in particular:  In an e-mail dated June 8, 2018, Fidan stated that, "Saray is the ultimate cnee in Turkey on HBL," with "cnee" being shorthand for "consignee" and "HBL" for the "MTS House B/L."  Saray Opposition at 5; Dkt. 106, Exh. 2.  According to Saray, Fidan then "goes on to quote as follows:  We are not able to get hold of Saray, the owners of this cargo. They are the people who have to make the decision as to what to do with this shipment."  Saray Opposition at 5; *see* Dkt. 106, Exh. 2.  Saray also quotes a June 6, 2017 e-mail in which Fidan states:  "On behalf of Oxyde's buyer who is the owner of this cargo, Oxyde needs MSC to dramatically reduce these charges and bring it down to a manageable level."  Saray Opposition at 6; Dkt. 106, Exh. 3.

Although Saray attempts to paint these conversations as "admissions" from Fidan, the e-mails on their face tell a very different story.  As an initial matter, the Court does agree that Fidan calls Saray the "ultimate cnee" in his June 8, 2018 e-mail.  However, Saray's other representations are questionable at best.  While Saray is correct that Fidan "quote[s]" that Saray is the "owner[] of this cargo," the e-mail reflects that he is *quoting Oxyde*.  *See* Dkt. 106, Exh. 2 ("Following our meeting, below is the message we received from Oxyde yesterday night.").   Oxyde, of course, filed suit in the Southern District of Texas disclaiming any ownership interests in the goods, therefore disclaiming any responsibility for the Redelivery Charges.  Saray has presented no logical reason how, by relaying Oxyde's views, MTS somehow adopted those beliefs.  Moreover, in this e-mail Fidan goes on to firmly state that "Oxyde is the shipper of this cargo and they are responsible for this cargo," and that "[a]ccording to above message"—*i.e.*, Oxyde's message that Saray is the "owner[] of this cargo"—"they are rejecting the ownership and they seem like nearly abandoning this cargo."  *Id.*

Similarly, in the June 6, 2017 e-mail, Fidan lists what he calls the "combined requests of MTS and Oxyde together as below," which includes the statement that Saray cites, namely that "[o]n behalf of Oxyde's buyer who is the owner of this cargo, Oxyde needs MSC to dramatically reduce these charges and bring it down to a manageable level." Dkt. 106, Exh. 3. Fidan clearly indicated that the e-mail included Oxyde's requests in addition to MTS's. And the text of the quoted statement at issue was in blue, not the black color that was used to mark MTS's statements, reflecting that this was a message from Oxyde. Moreover, the quoted statement specifically references "Oxyde['s] needs," not MTS's, further confirming that this is a statement from Oxyde. Accordingly, these e-mails are by no means "admissions" that Saray was the owner of the Cargo— only that Oxyde thought it was.[15]

Nor do these e-mails demonstrate that Saray was the consignee. As discussed above, the MTS House B/L explicitly included a space to designate a "consignee," and MTS and Oxyde elected not to list Saray. Saray has not provided a convincing argument for why the Court should consider it, the "notify" party, as the "consignee." In sum, a stray, singular reference by Fidan to Saray as the "ultimate cnee," made in the course of MTS's efforts to resolve a post-shipping dispute, says little about the intent of the parties in entering into the MTS House B/L.

Although the Court does not find these arguments convincing, it recognizes that there nonetheless remain disputed issues of fact. For instance, the parties dispute whether Saray was in fact the holder of the MTS House B/L, *compare* Saray Opposition at 4 *with* MTS Motion at 17, and there is insufficient evidence in the record for the Court to find the absence of a genuine dispute on this question. And while the e-mails may not reflect that Saray is the owner of the goods, Saray

---

[15] After the Court questioned the veracity of this line of reasoning during oral argument, Saray, rather surprisingly, doubled down on this both during oral argument and in its post-argument letter. *See* 2/11/21 Tr. at 6-9; Dkt. 123.

has introduced invoices from Oxyde reflecting that it purchased the Cargo.  *See* Dkt. 111, Exhs. 9, 10.  In response, MTS has repeatedly argued that these invoices cannot demonstrate ownership because they included a CIF term.  MTS Motion at 17-18; MTS Reply at 6; MTS Opposition at 15 n.10.  As noted above, "CIF is a trade term which means that '[t]he seller is responsible for paying the cost, freight and insurance coverage necessary to bring the goods to the named port of destination.'"  *Italverde Trading, Inc.*, 485 F. Supp. 2d at 199 (quoting *St. Paul Guardian Ins. Co.*, 2002 WL 465312, at *4).  Under INCOTERMS, a set of pre-defined uniform commercial terms published by the International Chamber of Commerce, which governs the shipment here, *see* Dkt. 111, Exhs. 9, 10, a CIF term "does not govern change in title," *Italverde Trading, Inc.*, 485 F. Supp. 2d at 199; *see also* Incoterms 2010, International Chamber of Commerce, https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010/ (accessed March 7, 2021) (describing the meaning of CIF).

MTS makes much of the inclusion of a CIF term in the invoices.  But the Court is, at most, left with a term that seemingly says nothing about the transfer of title.  *See St. Paul Guardian Ins. Co.*, 2002 WL 465312, at *4 ("INCOTERMS, however, only address passage of risk, not transfer of title."); *see also Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1282 (Ct. Int'l Trade 2009) ("[T]he relevant Incoterms (including FOB, CFR, and CIF) deal directly with the transfer of risk, rather than transfer of title.").  The parties do not address if and when title passed separate and apart from these terms, leaving the Court unable to determine if Saray was the "owner" or "person entitled to the possession of the cargo."  *See Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 846-47 (2d Cir. 1985) ("Title to the goods usually passes from the seller to the buyer when the seller delivers the goods to the carrier and the carrier or its agent issues a bill."); *see also Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 825 (2d Cir. 2006) (noting that a "charterer may . . . rely

on the bills of lading to establish its ownership and the carrier's receipt of the goods"); *APL Co. Pte. v. UK Aerosols Ltd.*, 582 F.3d 947, 952 (9th Cir. 2009) ("A bill of lading . . . operates as a document of title." (citing *Pollard v. Vinton*, 105 U.S. 7, 8 (1881)).  Instead, Saray has only conclusorily argued that it is entitled to possession, and has not "present[ed] evidence to support its motion" that would allow the Court to rule in its favor.  *Barhold*, 863 F.2d at 236.

Accordingly, because the Court cannot determine whether Saray was the holder of the bill of lading, owner of the goods, or person entitled to possession, the Court cannot conclude whether Saray was a "merchant" for purposes of the MTS House B/L.  The Court is therefore unable to grant Saray's cross-motion or MTS's motion.

### D.  MTS's Arguments that COGSA Does Not Apply Are Unavailing

Notwithstanding the fact that Saray's ability to sue on the MTS House B/L remains in dispute, the Court addresses several additional arguments raised in MTS's motion for summary judgment, as these could potentially be dispositive.  MTS argues that: (1) Saray cannot bring a COGSA claim because it disclaimed ownership for the goods; (2) COGSA is inapplicable to these claims because the goods were not damaged or lost; and (3) COGSA does not apply because the sale was appropriate.  *See* MTS Motion at 14-24.  The Court rejects each of these arguments.

The Court begins with, and easily dispels, MTS's contention that Saray cannot sue under COGSA because it disclaimed ownership of the Cargo.  In support of its argument, MTS points to the Original Complaint, in which Saray stated that it "does not admit ownership."  *Id.* at 15; *see* Original Compl. ¶ 42.  While the doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase," *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8 (2000), Saray has not taken a contradictory position in this case.  Put simply, Saray's initial decision to decline to admit

ownership is not equivalent to actively disclaiming ownership.  The Court therefore rejects MTS's suggestion that Saray is estopped from claiming ownership now.

MTS's second argument, that COGSA is inapplicable because the goods were not damaged or lost, also lacks merit.  Although most cases frame the plaintiff's burden in making a *prima facie* showing as requiring "(1) delivery of the goods to the carrier in good condition and (2) outturn by the carrier in damaged condition," *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir. 1982)), COGSA clearly applies to the non-delivery of goods, *see, e.g.*, *OOO v. Empire United Lines Co.*, 557 F. App'x 40, 44 (2d Cir. 2014), *as corrected* (Feb. 7, 2014) (noting that COGSA applies where "a carrier intentionally gives the cargo to a briber after shipment or intentionally allows or participates in a theft prior to shipment," since in those instances "the carrier is responsible for having delivered the cargo to an improper party while COGSA applied"); *N.Y. Marine & Gen. Ins. Co. v. S/S Ming Prosperity*, 920 F. Supp. 416, 422 (S.D.N.Y. 1996) (assessing a COGSA claim for the non-delivery of goods).  In support of its argument, MTS cites to *Starr Indem[nity] & Liability Co. v. Transfair North American International Freight Services*, No. C17-697 (RAJ), 2018 WL 4002541, at *4 (W.D. Wash. Aug. 22, 2018).  But in *Starr Indem[nity]*, the court determined that COGSA did not apply because a shipment was simply delayed, but no cargo was destroyed, after an engine failure on the ship.  This is quite unlike the case before the Court, where the Cargo was not delivered to its final location at all.

Finally, MTS argues that the sale was justified for two reasons.  First, it contends that Saray's suit is barred because the sale was "judicially sanctioned."  MTS Motion at 20.  But while the Southern District of Texas permitted the sale, it appears that the court explicitly reserved

31

Saray's right to sue.  Dkt. 23.[16]  Second, MTS reasons that the sale was justified because shipping charges fell on MTS and Oxyde, and because MSC was required to comply with the orders from U.S. Customs.  MTS Motion at 22-24.  But even if MTS was required to mitigate its costs and MSC was required to comply with the Redelivery Notices, this does not necessarily mean that MTS was permitted to sell the Cargo to pay for its additional costs.  Taken to its logical extreme, such a rule would permit shippers to sell cargo when faced with any additional charges.[17]  Such a rule finds no support in the text of COGSA.

### E.  If COGSA Applies, the $500 Package Limitation Does Not Apply

Finally, because it concerns purely legal arguments, the Court addresses the question of whether COGSA's $500 package limitation applies.  COGSA provides that "[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."  46 U.S.C § 30701 note, § 4(5).  "This declaration, if embodied in the bill of lading, shall be *prima facie* evidence, but shall not be conclusive on the carrier."  *Id.*

MTS contends that any damages are limited to $500 per container.  Accordingly, because the MTS House B/L states that the Cargo contained 65 sealed containers, MTS contends that any

---

[16] As noted above, the court stated that "that all rights are reserved for Saray to pursue any and all claims related to a return of the $820,000.00 against MTS or any other party."  Dkt. 23 at 1.  Although it is not clear why the court seemingly limited the right to recovery to $820,000, as that was the approximate amount of the extra transportation and storage charges, *see* Dkt. 124, Exh. B at 16-19, that question is not before the Court at this stage, nor have the parties addressed it in their briefs.

[17] MTS does not argue, as Oxyde originally did, that the MTS House B/L required Saray, as the "receiver" of the Cargo, to pay for the additional demurrage charges.  *See Oxyde Chemicals, Inc. v. MTS Logistics, Inc.*, No. 17 Civ. 7283, Dkt. 1.  Accordingly, the Court does not consider whether these shipping costs in fact should have been borne by Saray.

recovery is limited to $32,500.  MTS Motion at 24-25.  In response, Saray makes two main arguments:  First, it contends that if COGSA's $500 limitation does apply, the proper "package" inquiry is the number of "bags" listed on the MTS House B/L, not the number of "containers." Saray Opposition at 10.  Second, it contends that COGSA's $500 per package limitation does not apply because (a) MTS failed to offer the shipper a fair opportunity to declare a higher value and (b) MTS's failure to deliver the goods constituted an unreasonable geographic deviation.  *Id.* at 11.

### 1.  The "Bag" Is the Proper "Package" for COGSA Purposes

The Court begins with MTS's contention that the proper "package" is the container.  Here, one bill of lading listed 440 bags (519,200 kgs) of resin, loaded into 22 containers, *see* 5542 B/L at 1, and the other listed 860 bags (1,014,800 kgs) of resin, loaded into 43 containers, *see* 5592 B/L at 1.  The MTS House B/L further stated that if "a Container is not stuffed by or on behalf of the Carrier or the parties characterize the Container as a package or a lump sum freight is assessed, . . . each individual such Container, including in each instance its contents, shall be deemed a single package and Carrier's liability limited to $500 with respect to each such package."  B/L Terms at 1.

It is well-established that if a bill of lading lists two units, both of which are "susceptible of being COGSA packages," the bill of lading is "inherently ambiguous."  *Monica Textile Corp. v. S.S. Tana*, 952 F.2d 636, 642-43 (2d Cir. 1991).  As a contract of adhesion, an ambiguous bill of lading must be construed against the carrier, *see id.*, and therefore if a "bill of lading discloses not only the number of containers but the number of cartons within them, the cartons," *i.e.*, the smaller unit, "not the containers, will be treated as COGSA packages," *Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam, Her Engines, Boilers, Etc., Nedlloyd Lijnen B.V. (Nedlloyd Lines)*, 759 F.2d 1006, 1013 (2d Cir. 1985).  There must be an "unequivocal," *Monica Textile Corp.*, 952

33

F.2d at 642, and "clear agreement between the parties" to construe a container as the relevant "package" when a smaller unit is listed, *Binladen BSB Landscaping*, 759 F.2d at 1013.

Because the MTS House B/L lists two units—bags and containers—that are susceptible to being considered "packages," the Court concludes that the bags are the relevant packages for COGSA purposes. There is no clear agreement in the MTS House B/L to treat the containers as the relevant packages. Even if the containers were sealed when delivered to the carrier, the boilerplate clause purporting to limit the package to a container if the container is "not stuffed by or on behalf of the Carrier" does not constitute an "unequivocal" agreement between the parties. *See Monica Textile Corp.*, 952 F.2d at 642-43 (concluding that a bill of lading's "boilerplate clause" stating that "[w]here container(s) is stuffed by Shipper or on his behalf, and the container is sealed, the Carrier's liability will be limited to U.S. $500 with respect to the contents of each container, except when the Shipper declares value on the face hereof . . . and pays additional charges on such declared value" did not constitute an unequivocal agreement between the parties).

### 2. The Record Is Insufficient for the Court to Determine Whether COGSA's $500 Package Limitations Applies

However, even though the "bags" are the relevant "packages" here, the Court is, at this stage, unable to rule whether COGSA's $500 package limitation does in fact apply. Saray makes two arguments in this respect. First, Saray contends that MTS failed to offer the shipper a fair opportunity to declare a higher value, as there was no space on the MTS House B/L to do so. Saray Reply at 7-8. "In addressing the question of whether a carrier may invoke COGSA's per package limitation, district courts in the Southern and Eastern Districts [of New York] have generally looked to whether the bill of lading incorporates COGSA, refers to COGSA's $500 limitation, and/or states that the shipper will have to declare a higher value in order to avoid the limitation." *Delphi-Delco Elecs. Sys. v. M/V NEDLLOYD EUROPA*, 324 F. Supp. 2d 403, 424 (S.D.N.Y. 2004)

(listing cases).  A showing that the bill of lading "expressly limits liability to $500 per package" and "provides a space for the shipper to insert a higher value" "demonstrate[s] that the parties did not contract to avoid the COGSA liability limit."  *Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*, 167 F.3d 99, 101 (2d Cir. 1999).  If, by contrast, "the liability limitation is ambiguous or where 'the bill of lading requires the shipper to follow a "circuitous" route in order to discover what set of rules establishes the liability limitation on a shipment,' the [carrier] does not meet [its] burden" to show that the shipper is bound by the $500 limitation.  *Delphi-Delco Elecs. Sys.*, 324 F. Supp. 2d at 424 (quoting *MacSteel Int'l USA Corp. v. M/V IBM Abdoun,* 154 F. Supp. 2d 826, 833-34 (S.D.N.Y. 2001)).

Here, the MTS House B/L provided that liability was limited to $500 per package, "unless the nature of the cargo and valuation higher than $500 per package or per shipping unit shall have been declared by the Merchant before shipment and inserted in this Bill of Lading, and extra freight paid if required."  B/L Terms at 1.  The MTS House B/L provided a space "Declared Value by Shipper," which is stamped "NVD," commonly understood to mean "no declared value."  5542 B/L at 1; 5592 B/L at 1; MTS Opposition at 23.  Accordingly, while Saray contends that it did not have the opportunity to declare a higher value, the MTS House B/L clearly provided the shipper the opportunity to do so.  The Court therefore agrees with MTS that Saray cannot claim that it was deprived of a fair opportunity to declare a higher value such that the $500 package limitation would not apply.

Saray next contends that the $500 limitation does not apply because the failure to deliver the Cargo to Turkey constituted an unreasonable deviation.  COGSA provides that "any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom."  46 U.S.C.

§ 30701 note, § 4(4).  "The doctrine of deviation in the law of carriage may be traced to the pre-COGSA law of marine insurance." *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 31 (2d Cir. 1986). Because "the insurer was deemed to have accepted only that risk reasonably contemplated," if "the vessel, without excuse, voluntarily and unjustifiably departed from the usual commercial or contractual route, the policy was voided, and, in order to protect shippers in the event cargo was lost, the carrier was placed in the position of the insurer for liability purposes." *Id.*  "[T]he doctrine of deviation is applicable only to the carrier's voluntary action in unjustifiably deviating when the deviation has so changed the essence of the agreement as to effect its abrogation."  *Id.* at 32 (citation and internal quotation marks omitted).  "Originally, the doctrine covered only cases of geographic departure from the contract voyage," *B.M.A. Indus., Ltd. v. Nigerian Star Line, Ltd.*, 786 F.2d 90, 91 (2d Cir. 1986) (citing *The Willdomino v. Citro Chem. Co.*, 272 U.S. 718 (1927)), but "[o]ther decisions extended the concept of deviation (or 'quasideviation') to unauthorized on-deck stowage," *id.* at 91-92.[18]  But the doctrine is a limited one, and it is not an unreasonable deviation for the carrier to, for instance, engage in criminal conduct or intentionally give cargo to the incorrect party.  *Id.* at 92; *Italia Di Navigazione, S.p.A. v. M.V. Hermes I*, 724 F.2d 21, 22 (2d Cir. 1983).  Moreover, "mere negligence, lack of due diligence, or a failure to properly handle, stow, care, or deliver cargo," which "might violate the duty imposed by COGSA properly and carefully to carry and care for the cargo," has never "constituted deviation."  *Sedco, Inc.*, 800 F.2d at 32.

---

[18] The Second Circuit has also expanded this doctrine to cover instances in which a "carrier that has issued an on board bill of lading erroneously representing that goods were loaded aboard its ship, regardless whether or not the carrier acted fraudulently," on the basis that such an action had traditionally been considered "unreasonable." *Berisford Metals Corp.*, 779 F.2d at 846.

The record is not sufficiently developed at this point for the Court to rule if any deviation was unreasonable.  For instance, the parties dispute the exact route the shipment took.  *Compare* Saray Cross-Motion at 7-8 ("Here, the cargo, intended for Istanbul from Houston was offloaded at Sines, Portugal and then returned to Houston and never delivered.") *with* MTS Reply at 3 ("There is no evidence before the Court that the Cargo was unloaded in Portugal, and the enveloping narrative is false.").  Without even knowing what happened, the Court is unable to determine what exact deviations occurred and whether they generated "unanticipated and additional risks." *General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes*, 706 F.2d 80, 87 (2d Cir. 1983).  And although complying with a government order is not typically an unreasonable deviation, *see Sedco, Inc.*, 800 F.2d at 31 ("We agree with the district court that the [defendant ship's] deviation to Malta was . . . objectively reasonable.  Certainly, that the British Government requisitioned the [defendant ship] and commanded that she discharge her cargo at a convenient port and proceed to Southampton is sufficient by itself to support this finding."), that does not mean that certain stops taken on the way back to Houston, Texas or MTS's failure to continue the voyage on to Turkey after the Cargo was released was reasonable, *cf. id.* at 32 (looking to the carrier's conduct after a reasonable deviation, but concluding that it amounted only to negligence).  These factual disputes preclude the Court from ruling if any deviation was justified.  The Court therefore declines to conclusively rule on this issue at this time.

## IV.  Conclusion

For the reasons stated above, both MTS's motion for summary judgment and Saray's cross-motion for summary judgment are denied.  Whether Saray was a "merchant" under the MTS House B/L, whether there was an unreasonable deviation, and whether MTS has any defenses to liability remain in dispute.  Within seven days of the date of this Opinion and Order, the parties must submit

a joint letter addressing whether referral to the Court-annexed mediation program or to the Honorable Gabriel W. Gorenstein, United States Magistrate Judge, for a settlement conference would be beneficial.  Within thirty days from the date of this Opinion and Order, the parties must submit their joint proposed pretrial order and the other required pretrial filings required by Rule 7 of the Court's Individual and Practices in Civil Cases.  The parties should be ready for trial by August 2, 2021.

The Clerk of the Court is respectfully directed to terminate the motions pending at docket numbers 101 and 108.

SO ORDERED.

Dated: March 30, 2021
       New York, New York

_____
JOHN P. CRONAN
United States District Judge