UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                    :

SARAY DOKUM VE MADENI AKSAM SANAYI :
TURIZM A.S.,
                    :

             Plaintiff,      :       17 Civ. 7495 (JPC) (GWG)

                    :

      -v-               :       <u>FINDINGS OF FACT AND</u>

                    :       <u>CONCLUSIONS OF LAW</u>

MTS LOGISTICS, INC.,
                    :

            Defendant.     :

                    :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Saray Dokum ve Madeni Aksam Sanayi Turizm A.S. ("Saray"), a Turkish

architectural manufacturing company, brings this action against Defendant MTS Logistics, Inc.

("MTS"), a New York-based non-vessel operating common carrier ("NVOCC"),[1] under the United

States Carriage of Goods by Sea Act ("COGSA").[2]   Saray alleges that MTS failed to deliver

1,534,000 kilograms of S-PVC Resin Formosa Formolon 622 (the "Resin"), which Saray

---

[1] An NVOCC "is one who holds [itself] out to provide transportation for hire by water in interstate commerce, or in commerce from the United States who assumes or has liability for safe transport," but "does not [itself] undertake the actual transportation of cargo," and rather "delivers the shipment to an ocean carrier for transportation." *Royal & Sun All. Ins., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 140 n.2 (2d Cir. 2010) (quoting 1-1 Saul Sorkin, Goods in Transit § 1.5(8))*; see also Ins. Co. of N. Am. v. S/S Am. Argosy*, 732 F.2d 299, 301 (2d Cir. 1984) ("NVOCCs operate as middlemen," as "they arrange for relatively small shipments to be picked up from shippers, consolidate the smaller parcels, and ship them via a carrier or several carriers," but "do not . . . own or charter the ships that actually carry the cargo.").

[2] COGSA was previously codified at 46 U.S.C. App. §§ 1300-1315. "Congress has since 'reorganiz[ed] and restat[ed] the laws . . . in the appendix to title 46, and COGSA's provisions have been recodified at 46 U.S.C. § 30701 note." *Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.*, 547 F.3d 351, 354 n.2 (2d Cir. 2008) (alteration in original) (quoting Act of Oct. 6, 2006, Pub. L. No. 109–304, 120 Stat. 1485), *abrogated on other grounds*, *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89 (2010).

purchased from non-party Oxyde Chemicals, Inc. ("Oxyde"), to Istanbul, as provided for in two bills of lading[3] issued by MTS. Saray seeks money damages, and both parties seek attorneys' fees.

Following resolution of the parties' unsuccessful motions for summary judgment, *see Saray Dokum ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics, Inc.*, No 17 Civ. 7495 (JPC), 2021 WL 1199470 (S.D.N.Y. Mar. 30, 2021), the Court conducted a two-day bench trial from October 24, 2022 to October 25, 2022. Having considered the evidence admitted at trial, assessed the credibility of the witnesses, and applied the relevant law, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. As set forth below, the Court concludes that while Saray has standing to sue under the relevant bills of lading, it has failed to prove MTS's liability. In addition, the Court finds Saray liable to MTS for certain attorneys' fees as outlined below.

## I. Procedural Background

As explained in more detail in the Court's Findings of Fact, Saray commenced this action on July 11, 2017 in the Southern District of Texas, where it was assigned to the Honorable Nancy F. Atlas. Dkts. 1 ("Compl."), 4. In the original Complaint, Saray brought claims against MTS for a declaratory judgment, breach of contract, negligence, conversion, and legal fees. Compl. ¶¶ 15-21, 28-44. On September 29, 2017, the case was transferred to this District pursuant to a forum-selection clause in MTS's bill of lading "providing that any dispute 'shall be governed by the United States District Court for the Southern District of New York.'" Dkt. 24 (memorandum and

---

[3] "A bill of lading is a document issued by a carrier . . . to a shipper . . . record[ing] that a carrier has received goods from the party that wishes to ship them, stat[ing] the terms of carriage, and serv[ing] as evidence of the contract for carriage." *Maersk Line A/S v. Carew*, 588 F. Supp. 3d 493, 499 (S.D.N.Y. 2022) (internal quotation marks omitted); *see also MTS Logistics Inc. v. Innovative Commodities Grp.*, 442 F. Supp. 3d 738, 743 (S.D.N.Y. 2020) (noting that bills of lading are "[i]n short, . . . 'essentially, contracts'" (quoting *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18-19 (2004))).

order of Judge Atlas quoting the bill of lading); *see also* Dkt. 25 (transfer order).  Upon arrival in

this District, the case was initially assigned to the Honorable Paul G. Gardephe.  *See* Oct. 2, 2017

Case Opening Initial Assignment Notice.  On January 9, 2020, pursuant to a court-ordered

stipulation of the parties, Saray filed an Amended Complaint raising a single claim against MTS

under COGSA, and the Court dismissed any remaining claims with prejudice.  Dkts. 71, 73 ("Am.

Compl.").  MTS answered with counterclaims for unjust enrichment and legal fees.  Dkt. 74.[4]

Following the case's transfer to the undersigned on September 29, 2020, *see* Sept. 29, 2020

Notice of Case Reassignment, the Court denied the parties' cross-motions for summary judgment

on March 30, 2021, *see Saray*, 2021 WL 1199470.  The Court held in relevant part that (1) the

Amended Complaint relates back to the original Complaint and thus was not barred by COGSA's

one-year statute of limitations, *id.* at *5-6; (2) while a merchant can sue on a bill of lading under

COGSA, *id.* at *12-13, a dispute of fact existed as to whether Saray was the holder of the relevant

bills of lading at the time of the pertinent events in this case such that it can be considered a

merchant, *id.* at *13-15; (3) Saray's lawsuit was not barred by the fact that MTS's ultimate sale of

the Resin was "judicially sanctioned" by Judge Atlas because Judge Atlas's order permitting the

sale "explicitly reserved Saray's right to sue," *id.* at *15; and (4) the record was not sufficiently

developed to determine whether MTS's failure to deliver the Resin was an "unreasonable

deviation" that would render COGSA's $500 per package liability limitation inapplicable, *id.* at

*17-18.  Accordingly, the Court ordered this case to proceed to trial on the issues of "[w]hether

Saray was a 'merchant' under the [relevant bills of lading], whether there was an unreasonable

deviation, and whether MTS has any defenses to liability."  *Id.* at *18.

---

[4] MTS confirmed that it has since "withdrawn its claim for Unjust Enrichment."  Dkt. 190
at 6.

Following unsuccessful settlement negotiations, *see* Dkts. 145, 146, and a brief reopening of discovery in light of Saray's late production of the originals of the relevant bills of lading, *see* Feb. 1, 2022 Minute Entry; Dkt. 176 at 42:22-43:18, trial commenced as scheduled on October 24, 2022.  The Court heard testimony from two witnesses: Murat Sarayli ("Sarayli"), Tr.[5] at 19:19-105:25, a member of Saray's board of directors in charge of new investment, *id.* at 20:21-23, and Mehmet Can Fidan ("Fidan"), *id.* at 106:5-226:14, MTS's vice president in charge of export, *id.* at 109:6-9.  Following the conclusion of trial, both parties submitted post-trial briefing on November 11, 2022.  Dkts. 190 ("Saray Br."), 191 ("MTS Br.").

## II.  Bench Trial Standard

"In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  Accordingly, the Court below sets forth its findings of facts, followed by its conclusions of law.  Additional facts not specifically found in the findings of fact section, *see infra* III, may nonetheless be included in the Court's conclusions of law, *see infra* IV.  *See also Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, 502 F. Supp. 3d 760, 769 (S.D.N.Y. 2020) ("For the avoidance of doubt, the Court has also found additional facts that are relevant to the analysis, which are not included in this section of the opinion, but are instead embedded in the discussion section.").

## III.  Findings of Fact[6]

Saray is a Turkish, family-run manufacturing company that has been "producing aluminum and PVDC resin profiles for architectural windows and doors" since 1980.  Tr. at 20:25-22:6.  Its

---

[5] "Tr." refers to citations to the trial transcript.  Dkts. 194, 196.

[6] The following facts are taken from witness testimony at trial and the exhibits admitted into evidence at trial ("Exh."), including Sarayli's declaration, Exh. 76 ("Sarayli Decl."), and Fidan's affidavit, Exh. 74 ("Fidan Aff."), but only to the extent that those statements are not inconsistent with testimony at trial.

board of directors consists of three members: Sarayli, who is "responsible for new . . . investments," *id.* at 20:21-23, Talin Dikici—Sarayli's sister—who is mainly in charge of purchasing, *id.* at 21:12-22:4; *accord id.* at 25:24, and Sarayli's other sister, *id.* at 57:2-6. Parseh Sarayli, Murat's father, is the founder of Saray and was the company's president in 2017, although as of the date of the bench trial he was in the process of retiring. *Id.* at 21:7-8; 57:7-20. Murat Sarayli and Dikici work together in managing Saray. *Id.* at 21:17-22:6.

Saray uses S-PVC Resin Formosa Fomolon 622 to manufacture its window profiles. *Id.* at 27:24-28:4; *see also* Sarayli Decl. ¶ 3. It regularly imports large quantities of this product from manufacturers in the United States. *See* Tr. at 40:15-24, 59:9-17; Exh. 78. In fact, between 2016 and 2021, Saray purchased roughly 36,981,608 kilograms of such resin in eighty-six separate shipments totaling over $36 million. Exh. 78; Tr. at 41:24-42:15. Oxyde was one of the manufacturers from which Saray frequently bought this resin . Exh. 78; Tr. at 40:15-20; Sarayli Decl. ¶ 28. Oxyde is located in Houston, Texas, and supplies chemicals, including resin, to manufacturing companies around the world. Fidan Aff. ¶ 8.

The relevant transaction between Saray and Oxyde occurred on November 15, 2016. Tr. at 28:5-24; Exh. 3 ("Saray-Oxyde Contract"). Pursuant to a contract between those two companies, Saray agreed to buy approximately 1,500 metric tons of S-PVC Resin Formosa Formolon 622, *i.e.*, the Resin, at a price of $885 per metric ton. Saray-Oxyde Contract at 1. The Saray-Oxyde Contract also provided that the goods were to be shipped "CIF Istanbul," *id.*, which Saray understood to mean that Saray was required to pay the cost, insurance, and freight of shipping the goods to Istanbul, Tr. at 45:10-46:5, 65:16-66:10.[7] The Saray-Oxyde Contract further

---

[7] Pursuant to the Incoterms 2010, "a set of pre-defined uniform commercial terms published by the International Chamber of Commerce that governs the shipment here," *Saray*,

required Saray to "make a 20% advance payment by November 21st, 2016" and then pay the "balance 80% cash . . . at sight" after which Oxyde would release the shipping documents to Saray. Saray-Oxyde Contract at 1.  Oxyde agreed to "effect shipment" roughly "20 days . . . after receipt of [the] 20% cash deposit."  *Id.*  In accordance with its payment obligations, Saray wired Oxyde an initial deposit of $259,500 on November 16, 2016.  Tr. at 44:21-45:3; Exh. 36.

In January 2017, Oxyde engaged MTS, an NVOCC with its main office in Manhattan, to ship the Resin to Istanbul in sixty-five containers, each forty feet long and eight feet wide and high.  Fidan Aff. ¶¶ 2, 4, 9; Exhs. 49-50; Tr. at 107:24-108:3.  MTS has thirty-eight employees, one of whom, Fidan, is the company's vice president in charge of overseeing the export of cargo by ocean carriage.  Tr. at 109:5-9; Fidan Aff. ¶ 3.  As an NVOCC, MTS does not own its own vessels.  Tr. at 108:4-5.  Instead, MTS "arrange[s] shipments for [its] customers" through its "service contracts . . . with steamship lines [and] ocean carriers," such as Mediterranean Shipping Company S.A. of Geneva ("MSC"), which, in 2017, was the largest steamship line for U.S. exports.  *Id.* at 108:6-109:1; Fidan Aff. ¶ 4.  In connection with such shipments, MTS is responsible for issuing bills of lading.  Tr. at 147:9-10, 148:5-15; Fidan Aff. ¶ 4.  Prior to the events of this

---

2021 WL 1199470, at *14; *accord* Saray-Oxyde Contract at 3, ¶ 5, "CIF" stands for "Cost Insurance and Freight."  Incoterms 2010, International Chamber of Commerce, https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010/ (last visited Aug. 11, 2023). Typically, "CIF" "means that *the seller* [*i.e.*, Oxyde] is responsible for paying the cost, freight and insurance coverage necessary to bring the goods to the named port of destination."  *Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp. 2d 187, 199 (E.D.N.Y. 2007) (internal quotation marks and brackets omitted) (emphasis added).  However, Sarayli testified that he understood this term to require *Saray*, not Oxyde, to pay the shipping costs.  *See* Tr. at 45:10-46:5, 65:16-66:10; *see also* Sarayli Decl. ¶ 22.  Because, as the Court previously concluded, "a CIF term does not govern change in title," *Saray*, 2021 WL 1199470, at *14 (internal quotation marks omitted), and because Saray was required to pay shipping costs under the relevant bills of lading as a merchant, *see infra*, whether Saray was required to pay these costs pursuant to the Saray-Oxyde Contract is irrelevant to the Court's resolution of the trial.

lawsuit, Oxyde had been a frequent customer of MTS since 2009, with Oxyde contracting with MTS to ship approximately 3,000 containers per year.  Tr. at 110:6-16.

After being hired by Oxyde, MTS engaged MSC to provide sixty-five empty containers and to transport the Resin across the Atlantic Ocean to Istanbul.  Fidan Aff. ¶¶ 9, 11.  Oxyde then arranged for MSC's sixty-five empty containers to be transported via a trucking company to Oxyde's warehouse, to have the containers loaded with the Resin, to apply seal numbers to each container, and to subsequently transport the loaded, sealed containers back to the Port of Houston.  *Id.* ¶ 11; *see also* Tr. at 111:9-112:3.  Oxyde also was responsible for preparing all the export documentation and paperwork for the shipments required by U.S. Customs and Border Protection ("U.S. Customs").  Tr. at 114:8-24; Fidan Aff. ¶¶ 19-20.

MTS simultaneously worked with Oxyde to begin preparing the bills of lading for the shipments of the Resin.  Fidan Aff. ¶ 10; Tr. at 112:23-113:8.  Oxyde sent the details of the shipments to MTS via email to be inserted into the bills of lading, and MTS drafted and made changes to the bills of lading based on Oxyde's instructions.  Fidan Aff. ¶ 10; Tr. at 113:9-18, 114:1-7, 116:13-117:25; *see* Exhs. 51, 52.  Per Oxyde's instructions, MTS split the shipments of the Resin into two bills of lading: one for twenty-two containers and another for forty-three containers.  Fidan Aff. ¶ 10; Exhs. 51 at 5, 53, 54.  MTS then created two "proof" bills of lading per Oxyde's instructions and sent them to Oxyde via email to review.  Fidan Aff. ¶ 12.  Both proof bills of lading list Oxyde as the "Shipper/Exporter," "To Order"[8] as the "Consignee," and Saray

---

[8] A "to order" clause denotes that the bill of lading is a negotiable instrument.  *Saray*, 2021 WL 1199470, at *11 (citing *Porky Prods., Inc. v. Nippon Exp. USA (Ill.), Inc.*, 1 F. Supp. 2d 227, 232 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998)); *see also* Fidan Aff. ¶ 10.  "Because the bills of lading were negotiable, the holder of the bill of lading would have the exclusive right to take possession of the underlying goods."  *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 309 n.7 (S.D.N.Y. 2011).

as the "Notify" party.[9]  Exh. 53, Boxes 2-4; Exh. 54, Boxes 2-4; Fidan Aff. ¶ 10; Tr. at 126:1-127:7.  The proof bill of lading numbered 51702SH35542 lists "Description of Goods" as 440 bags of the Resin loaded into twenty-two containers with a net weight of 519,200 kilograms, Exh. 53, Box 20, and the proof bill of lading numbered 51702SH35592 lists 860 bags of the Resin loaded into forty-three containers with a net weight of 1,014,800 kilograms, Exh. 54, Box 20.  Both proof bills of lading list the "Vessel" as "Sealand New York 705E," the "Port of Loading" as "Houston, TX USA," the "Port of Discharge" as "Istanbul, Turkey," and the estimated ship date as February 10, 2017, and they each attach a list of the containers by weight and seal number.  Exhs. 53, 54; Fidan Aff. ¶¶ 12, 16.

MTS then sent the two proof bills of lading to Oxyde for approval prior to issuing the official "original" bills of lading.  Fidan Aff. ¶ 12; Tr. at 113:9-25.  On February 10, 2017, after the sixty-five containers were loaded onto the *Sealand New York*, MTS prepared and issued the original bills of lading.  Fidan Aff. ¶¶ 15-17; Exhs. 79, 80 (collectively, the "Original Bills of Lading"); *see also* Tr. at 115:2-12.  The Original Bills of Lading were identical to the proof bills of lading except that they each were stamped "original" at the top, were signed by MTS at the bottom of the first page, and were affixed with a seal on the final page.  *See* Original Bills of Lading.  This rendered the Original Bills of Lading "negotiable" and transferrable to a third party. Fidan Aff. ¶ 10; Tr. at 126:11-18.

The last page of the Original Bills of Lading contains several terms and conditions relevant to this lawsuit.  *See* Original Bills of Lading at 4 ("Terms and Conditions").  First, Clause 1 of the Terms and Conditions provides several definitions, including defining "Merchant" as "the shipper,

---

[9] "A notify party is the party to be notified when the goods arrive at their destination." *Saray*, 2021 WL 1199470, at *1 n.1 (internal quotation marks omitted).

consignee, receiver, holder of this Bill of Lading, owner of the cargo or person entitled to the possession of the cargo." Terms and Conditions § 1(f).  Next, the Original Bills of Lading contain a "Clause Paramount"[10] (Clause 4) providing that "[t]he provisions of COGSA . . . shall govern before loading on and after discharge from the vessel and throughout the entire time the [Resin is] in the care, custody and/or control of [MTS]" and that MTS "shall not be liable in any capacity whatsoever for any delay, non-delivery, mis-delivery or other loss or damage to or in connection with the [Resin]."  *Id.* § 4(a), (b).  Clause 14 of the Terms and Conditions states that MTS's "liability . . . with respect to the [Resin] shall cease on the delivery or other disposition of the [Resin] in accordance with the orders or recommendations given by any government or authority or any person acting or purporting to act as or on behalf of such government authority" and that "the Merchant shall pay any additional costs resulting from the above mentioned circumstances." *Id.* at § 14(b), (c).  Next, Clause 17 of the Original Bills of Lading provides for a broad "Carrier's Lien" under which

> [t]he Carrier shall have a lien on the [Resin], inclusive of any Container owned or leased by the Merchant, as well as on any Charges due any other person, and any documents relating thereto, which lien shall survive delivery, for all sums due under this contract or any other contract or undertaking to which the Merchant was party or otherwise involved, including, but not limited to, General Average contributions, salvage and the cost of recovering such sums, inclusive of attorney fees.  Such lien may be enforced by the Carrier by public or private sale at the expense of and without notice to the Merchant.

*Id.* at § 17; *accord id.* § 1(b) (defining "Carrier" as "the Company named on the face side hereof and on whose behalf this Bill of Lading was issued and whether acting as carrier or bailee"—*i.e.*, MTS).  Finally, the Original Bills of Lading contain a forum-selection clause stating that "[a]ny

---

[10] "A maritime bill of lading in international trade will generally contain a provision often referred to as a Clause Paramount, which states that the bill of lading is subject to the provisions of [COGSA]."  *Run & Sun All. Ins., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 142 n.6 (2d Cir. 2010) (internal quotation marks omitted).

claim or dispute (if any) arising under this Bill of Lading . . . shall be governed by the United States District Court for the Southern District of New York, to whose jurisdiction the Carrier will submit." *Id.* § 24.

At some point between February 17 and February 21, 2017, while MTS was working to finalize the Original Bills of Lading, the *Sealand New York* set sail. Tr. at 60:18-20, 115:25-116:4. 118:1-7. Once completed, MTS sent the Original Bills of Lading to Oxyde at its Houston offices and did not retain any copies of the originals. *Id.* at 116:5-11; Fidan Aff. ¶ 15. Also around this time, on February 10, 2017, Oxyde invoiced Saray for the remaining 80% payment on the two shipments of the Resin, *see* Exhs. 81, 82; Tr. at 29:8-14, and Saray wired Oxyde that final payment in the amount of $1,038,000, Tr. at 39:1-16, 42:18-20, 44:21-45:6; Exh. 36 at 5. Oxyde then sent the Original Bills of Lading via courier to Saray. Tr. at 22:16-23:9, 99:5-15, 105:14-22; Sarayli Decl. ¶¶ 8-9. Saray has been in possession of those Original Bills of Lading since receiving them in late February 2017. Tr. at 22:21-25; Sarayli Decl. ¶ 10.

Because there is no direct shipping route between Houston and Istanbul, the Resin was scheduled to travel on the *Sealand New York* from Houston to Sines, Portugal, and then from Sines to Istanbul. Tr. at 130:7-11; Fidan Aff. ¶ 22. The entire journey was expected to last about thirty days. Tr. at 60:21-22. However, on February 28, 2017, at some point during the first leg of the journey, U.S. Customs issued a redelivery notice to the *Sealand New York* directing that the two shipments of the Resin be returned to the Port of Houston for further examination. Exh. 59 (the "Redelivery Notice"); Tr. at 168:6-11; Fidan Aff. ¶ 22. Consistent with the Redelivery Notice, the *Sealand New York* offloaded the Resin at Sines, and then MSC arranged for the Resin to be shipped back to Houston. Tr. at 130:12-14, 168:12-14.

MSC first notified MTS of the Redelivery Notice on March 20, 2017, while the Resin was en route back to Houston.  Fidan Aff. ¶ 21; Exh. 58; *see also* Exh. 63 at 36.  Once notified, MTS immediately informed Oxyde of the situation.  Fidan Aff. ¶ 23; Exh. 63 at 44.  Oxyde advised that the "full set of Original [Bills of Lading] are in Turkey" and that they would "attempt to locate the Original [Bills of Lading] and return them back to MTS."  Exh. 63 at 44.  MTS employees also attempted to reached out to MSC to learn the cause of the Redelivery Notice, but MSC repeatedly responded that it was not permitted to divulge any information.  Exh. 60; Fidan Aff. ¶ 21.  MTS subsequently attempted to contact the U.S. Customs Officer overseeing the redelivery—Officer Henry Cruz of the Outbound Enforcement Team—but Officer Cruz refused to reveal why the shipment had been recalled.  Fidan Aff. ¶ 29; Tr. at 123:5-9; Exh. 84 at Oxyde000028.  In fact, the sole direct evidence adduced at trial relating to the decision of U.S. Customs to demand redelivery of the Resin was an email from Officer Cruz to Oxyde stating only, "Shipment is under document review and further inspection."  Exh. 84 at Oxyde000028.

 The Resin arrived back at the Port of Houston on April 6, 2017.  Fidan Aff. ¶ 24.  MSC charged MTS additional freight for the Resin's return journey.  *Id.* ¶ 25.  On April 18, 2017, MTS attempted to invoice Oxyde for the additional freight charges, but the following day, Oxyde declined to pay, reasoning "[w]e are not able to process your inv[oice] since we did not have any agreement with you . . . to bring container back to Houston. . . .  We contracted with you . . . to deliver these container[s] to Istanbul . . . and you . . . have failed to perform per agreed terms."  Exh. 63 at 41-42; Fidan Aff. ¶ 25.  On May 2, 2017, with MTS and Oxyde still unable to reach an agreement over the additional freight charges, MTS's former legal counsel, Gareth W. Stewart, Esq., advised Oxyde via letter that MTS intended to foreclose on a lien against the Resin in the event of Oxyde's continued refusal to pay the additional freight charges.  Exh. 68 at 1-2; Fidan

Aff. ¶ 26.  In addition, while sitting on the dock at the Port of Houston pending the U.S. Customs investigation, the Resin accrued daily detention and demurrage charges of roughly $400 per container.[11]  Fidan Aff. ¶ 28; Tr. at 124:6-15.

On June 5, 2017, U.S. Customs informed MSC that the Resin was no longer under investigation and could be released and reexported.  Fidan Aff. ¶ 27.  That same day, MSC sent an email to MTS, billing MTS $1,268,150 for the additional fees that the Resin had incurred while it sat on the dock at the Port of Houston during the investigation.  Exh. 62 at 42; *see* Fidan Aff. ¶ 28.  MTS also contacted Oxyde that day to inform them of the total charges.  Fidan Aff. ¶ 28; Exh. 63 at 15.  Oxyde responded the following day, demanding that MTS negotiate with MSC to reduce those charges.  Fidan Aff. ¶ 31; Exh. 63 at 13.  Oxyde once again disclaimed ownership of the Resin, and, for the first time, notified MTS of its belief that Saray was the Resin's lawful owner and requested that the Resin be reexported to Saray in Istanbul.  Fidan Aff. ¶ 31; Exh. 63 at 13; Tr. at 125:12-18, 131:4-7; *see also* Exh. 62 at 41.[12]  MTS relayed Oxyde's request to MSC, and began negotiating with MSC to reduce the detention and demurrage charges.  Exh. 62 at 41; Tr. at

---

[11] As Fidan explained at trial, "demurrage charges" are "fees . . . for containers sitting in the terminal [and] keeping terminal space" whereas detention charges are for "keeping the carrier's equipment more than th[ree] days"—a period which is called "free time."  Tr. at 177:10-19.  Detention charges were imposed by the Port of Houston on MSC and passed down to MTS, whereas demurrage charges originated from MSC.  *Id.* at 123:20-23; *see also Saray*, 2021 WL 1199470, at *2 n.3.

[12] While Sarayli claimed at trial that Saray had hired a lawyer and conducted an investigation following the Redelivery Notice and that Saray was aware of the daily-accruing charges, Tr. at 87:17-88:17, the emails between Oxyde, MTS, and MSC demonstrate that Saray was conspicuously absent throughout the entire investigative and negotiation process.  For example, on June 6, 2017, while negotiating for reduced fees with MSC, MTS requested on Oxyde's behalf that the Resin be reexported to Istanbul.  Exh. 62 at 41.  However, on June 8, 2017, MTS asked MSC to stand down on the reexport request, informing that Oxyde had reported it was "not able to get hold of Saray, the owners of this cargo," and that "they are the people who have to make the decision as to what to do with the shipment."  *Id.* at 37.  Moreover, Fidan testified that Saray never attempted to contact MTS during this time.  Tr. at 128:20-25.

124:21-125:6.  Over the next week, MTS sent Oxyde repeated reminders that detention and demurrage charges were still accruing, but Oxyde failed to respond.  Exh. 63 at 4-13.  Nor was Oxyde willing to negotiate with MSC on its own behalf.  Tr. at 125:3-6.  On June 12, 2017, after MSC warned MTS that the Resin had to be picked up from the Port of Houston by June 16, 2017, or else it would go into the General Order,[13] Fidan Aff. ¶ 32; Exh. 62 at 31, MTS instructed Stewart to write to Oxyde notifying of MTS's intent to foreclose on a lien against the Resin if the outstanding charges were not paid, Fidan Aff. ¶ 33; Exh. 69.  Stewart's letter explicitly directed Oxyde to "forward this letter-notice to the person or entity claiming ownership of the shipment."  Exh. 69 at 3 (emphasis removed).

The next day, on June 13, 2017, MTS reached an agreement with MSC to reduce the demurrage and detention charges by 60%.  Fidan Aff. ¶ 34; Exh. 62 at 28, 31.  MTS informed Oxyde of the reduced charges and requested that Oxyde pay those charges to avoid the Resin going to the General Order.  Fidan Aff. ¶ 35; Exh. 63 at 5-6.[14]  On June 14 and 15, 2017, MTS also sent messages to Saray, forwarding its communications with Oxyde regarding payment on the outstanding charges, but Saray never responded.  Fidan Aff. ¶ 36; Exhs. 65-67; Tr. at 129:1-10, 130:15-17, 131:12-21.  MTS finally received a response from Oxyde on June 15, 2017—one day before the Resin was set to go to the General Order.  Fidan Aff. ¶ 37; Exh. 63 at 2-4.  Oxyde claimed that it had "just heard from Talin with Saray that her uncle [w]ho was very sick, passed

---

[13] "General Order is a warehouse in each port that is operated by the government which holds abandoned and condemned or contraband cargos.  The goods are ultimately sold or destroyed by the government."  Fidan Aff. ¶ 32.  Goods held in a General Order warehouse eventually go to auction where they are "usually . . . sold for extremely low prices."  Tr. at 132:17-20.  While stored in the General Order warehouse pending auction, the goods continue to accrue warehouse fees which are "much higher" than typical storage fees.  *Id.* at 133:9-12.

[14] MSC agreed to reduce the charges on the condition that the Resin not go to the General Order.  Tr. at 132:21-133:21.

away" and that "[s]he herself had surgery recently," and thus requested "some more time to respond." Exh. 63 at 4.  MTS advised Oxyde that the General Order deadline could not be extended and that MSC would void the reduced demurrage and detention charges and the Resin would be sold at public auction for cheap.  Fidan Aff. ¶ 37; Exh. 63 at 2-3.  With Saray nowhere to be found, MTS decided that its only option was to pay MSC for the charges out of its own pocket.  Fidan Aff. ¶ 38.  MTS informed Oxyde of its decision, but as a final courtesy, "allow[ed] Oxyde 20 days to reimburse MTS all costs incurred and if that's done the cargo will immediately be released to Oxyde." Exh. 63 at 3.

Following the release of the Resin from U.S. Customs on June 19, 2017, Exh. 62 at 18, MTS negotiated with MSC to further reduce the total charges to $724,036.80, *id.* at 14.  *See also* Fidan Aff. ¶ 38.  MTS then took out a line of credit with its bank and paid MSC the charges on June 23, 2017.  Fidan Aff. ¶ 38; Exh. 70; Tr. at 132:5-11.  MTS also coordinated (and paid) to have the containers removed from the Port of Houston and trucked to and stored at a cheaper storage yard.  Fidan Aff. ¶ 39; Exh. 62 at 4-15; Tr. at 134:9-135:6; *see also* Tr. at 173:8-15, 174:3-5.  With Oxyde having not responded to MTS since its June 15, 2017 email and with Saray still nowhere to be found, Fidan Aff. ¶¶ 39-40; Exh. 63 at 1-2, MTS concluded that the Resin had been abandoned, and began arranging to sell it to recover their expenses, Fidan Aff. ¶¶ 39-40; Tr. at 195:13-16.  Between June 26 and June 27, 2017, MTS communicated with Oxyde that it had one final chance to pick up the cargo and reimburse MTS for its expenses, otherwise MTS would sell the cargo.  Fidan Aff. ¶ 40; Exh. 63 at 1-2.  MTS also forwarded these communications to Saray. Fidan Aff. ¶ 40; Exh. 67.

Saray finally appeared on July 11, 2017, when it initiated the present action in the Southern District of Texas, seeking among other things a declaration that MTS did not possess a lien over

the Resin and an injunction preventing MTS from selling the Resin.  Fidan Aff. ¶ 40; Compl.

¶¶ 15-27; Dkt. 6.[15]  After hearing oral argument, Judge Atlas provisionally granted Saray's request

to enjoin the sale on the condition that Saray post a bond for $820,000.  Dkt. 21; *see also* Exh. 42.

After Saray failed to post that bond, Judge Atlas denied Saray's application and ordered that MTS

"shall sell the Cargo in issue to recover its costs."  Dkt. 23 at 1.  In doing so, however, Judge Atlas

expressly noted "that all rights are reserved for Saray to pursue any and all claims related to the

return of the $820,000.00 against MTS or any other party."  *Id.*

   MTS subsequently sold the Resin to another chemical company called Polymerline at a

price of $820 per metric ton—5% less than the price for which Oxyde sold the Resin to Saray—

for a net amount of $1,238,528.  Fidan Aff. ¶ 41; Tr. at 139:5-20; Exh. 27.  Following the sale,

MTS reimbursed itself $846,590.54 for all of the expenses it had paid on the Resin following the

Redelivery Notice, and was left with $344,310 in surplus.[16]  Fidan Aff. ¶¶ 42-43; Tr. at 140:7-21.

MTS attempted to transfer this surplus to Oxyde, but Oxyde informed MTS that the funds should

be paid to Saray in Turkey, which MTS subsequently did.  Fidan Aff. ¶ 43; Tr. at 141:2-6.

---

[15] Oxyde also filed suit in the Southern District of Texas around this same time, seeking a declaration that it was not responsible for any detention or demurrage charges pursuant to the terms of the Original Bills of Lading, which stated that those costs were for the "receiver," and that it was not responsible for any other costs, as title had passed to Saray.  *See* Complaint, *Oxyde Chem., Inc. v. MTS Logistics, Inc.*, No 17 Civ. 2004 (GHM) (S.D. Tex.), Dkt. 1.  After Oxyde's case was transferred to this District, it was voluntarily dismissed in November 2017 by stipulation and order. Stipulation and Order of Dismissal, *Oxyde Cem., Inc. v. MTS Logistics, Inc.*, No. 17 Civ. 7283 (JMF) (S.D.N.Y.), Dkt. 21.

[16] While the difference between $1,238.528 and $846,590.54 is $391,937.46—not $344,310—there was no evidence presented at trial to account for this $47,627.46 discrepancy. Accordingly, the Court will credit Fidan's Affidavit in which he swears that the remaining amount was $344,310, not $391,937.46.

### IV.  Conclusions of Law

**A.     Jurisdiction, Choice of Law, and Venue**

"The parties stipulate that this is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure."  Dkt. 184 at 3.  The Court agrees.  "The admiralty jurisdiction of the federal courts is grounded in Article III of the Constitution."  *A.P. Moller-Maersk A/S v. Ocean Express Miami*, 550 F. Supp. 2d 454, 461 (S.D.N.Y. 2008); *see* U.S. Const. art. III § 2 (extending federal judicial power to "all Cases of admiralty and maritime Jurisdiction"); 28 U.S.C. § 1333(1) (providing "exclusive" federal jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction").  "Because the grant of admiralty jurisdiction and the power to make admiralty law are mutually dependent, the two are often intertwined . . . ."  *Kirby*, 543 U.S. at 23.  "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation."  *Id.* at 22-23.  Here, the Original Bills of Lading are clearly maritime contracts because they "require[] substantial carriage of goods by sea."  *Id.* at 27; *see also A-P Moller-Maersk*, 550 F. Supp. 2d at 461.  As such, federal law governs, and the Court may exercise admiralty jurisdiction "unless the contract's interpretation 'so implicate[s] local interests as to beckon interpretation by state law.'"  *MSC Mediterranean Shipping Co. v. Airlift Marine Servs. PVT Ltd.*, 579 F. Supp. 3d 484, 493 (S.D.N.Y. 2022) (brackets in original) (quoting *Kirby*, 543 U.S. at 27); *accord Kirby*, 543 U.S. at 23.  As neither party points to any such local interest, the Court applies federal maritime law to the interpretation of the Original Bills of Lading. *Id.*

Venue is appropriate in this District pursuant to a valid forum-selection clause in the Original Bills of Lading, and no public interest factor weighs to the contrary.  *See* Terms and Conditions § 24; *see also* Dkt. 24 at 3-4.

**B.      Applicable Law**

COGSA is "the culmination of a multilateral effort to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade." *Vimar Seguros y Reaseguros, S.A. v. M./V. Sky Reefer*, 515 U.S. 528, 537 (1995) (internal quotation marks omitted).   The statute "establishes rules that overlay bills of lading between carriers and their identifiable contracting partners—usually suppliers and consignors."  *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 70 (S.D.N.Y. 2009), *opinion adhered to on reconsideration*, 643 F. Supp. 2d 553 (S.D.N.Y. 2009), *and aff'd sub nom.*, *Chem One, Ltd. v. M/V RICKMERS GENOA*, 502 F. App'x 66 (2d Cir. 2012).

COGSA claims are "unique" in that "[a]n 'action under COGSA is a maritime action in the nature of a mixed tort, contract and bailment cause of action.'"  *Saray*, 2021 WL 1199470, at *10 (quoting *Texport Oil Co. v. M/V Amolyntos*, 11 F.3d 361, 367 (2d Cir. 1993), *overruled on other grounds*, *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995)); *see also Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co.*, 215 F.3d 1217, 1220-21 (11th Cir. 2000) (concluding that COGSA provides a "hybrid[]" claim "born of elements from contract and tort").   Under COGSA, a carrier must "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."  46 U.S.C. § 30701 note, § 3(2).  To establish a *prima facie* case under COGSA, Saray "bears the initial burden of proving both delivery of the goods to the carrier . . . in good condition, and outturn by the carrier or by the stevedore, for whose conduct the carrier is responsible, in damaged condition."  *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d Cir. 1977); *see also Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351-52 (2d Cir. 1981) ("[P]laintiff has the burden, which remains with it throughout the case, of proving that 'the goods were damaged while in the carrier's custody.'" (quoting *Pan-Am. Hide Co. v. Nippon Yusen*

*(Kabushiki), Kaisha*, 13 F.2d 871 (S.D.N.Y. 1921) (Hand, J.))).  In addition to claims for damaged goods, COGSA applies equally to non-delivery.  *Saray*, 2021 WL 1199470, at *15 (collecting cases).  Moreover, "if a carrier deviates unreasonably from a bill of lading, it breaches that contract of carriage and 'ousts' the provisions contained therein," and therefore violates COGSA.  *Ataei v. M/V Barber Tonsberg*, 639 F. Supp. 993, 999-1000 (S.D.N.Y. 1986).

"If plaintiff . . . establishes a *prima facie* case for recovery," it will "be entitled to prevail unless the carrier brings itself within one of the exceptions" for defenses to liability set forth in the statute.  *Caemint Food*, 647 F.2d at 352.  For instance, the carrier shall not be responsible for "loss or damage arising or resulting from," among other things, "[a]rrest or restraint of princes, rulers, or people, or seizure under legal process" or "any other cause arising without the actual fault or privity of the carrier and without the fault or neglect of the agents or servants of the carrier."  46 U.S.C. § 30701 note, § 4(2).  If the carrier-defendant proves that the breach implicates one of COGSA's exceptions, the burden shifts back to the plaintiff "to show concurrent negligence on the part of the carrier."  *Sunpride (Cape) (Pty) Ltd. v. Mediterranean Shipping Co.*, No. 01 Civ. 3493 (CSH), 2003 WL 22682268, at *30 (S.D.N.Y. Apr. 14, 1982) (citing *In re Ta Chi Nav. Corp., S.A.*, 667 F.2d 225, 227-29 (2d Cir. 1982)); *see also Republic of France v. French Overseas Corp.*, 277 U.S. 323, 334 (1928) (explaining that after the respondents "brought itself within the exception under its bill of lading, the burden is on petitioners to show that respondents' negligence was the cause of or contributed to the loss").

The parties both contend that the Pomerene Bills of Lading Act, 49 U.S.C. § 80101 *et seq.* (the "Pomerene Act"), which governs all bills of lading "issued by a common carrier for the transportation of goods," *inter alia*, "from a place in a State to a place in a foreign country," *id.* § 80102(5), applies to this dispute as well.  Saray Br. at 2-5; MTS Br. at 6-8; *accord* 46 U.S.C.

§ 30701 note, § 3(c)(4) ("[N]othing in [COGSA] shall be construed as repealing or limiting the application of any part of . . . the Pomerene Bills of Lading Act . . . ." (internal quotation marks omitted)).  The Pomerene Act provides, in pertinent part, that a common carrier conducting business pursuant to a negotiable to-order bill of lading (such as the Original Bills of Lading) "is justified in delivering the cargo to 'a person lawfully entitled to their possession' *or* to one in actual possession of the bill of lading."  *Ace Bag & Burlap Co., Inc. v. Sea-Land Serv., Inc.*, 40 F. Supp. 2d 233, 239 (D.N.J. 1999) (quoting 49 U.S.C. § 80110); *see also Int'l Harvester Co. v. TFL Jefferson*, 695 F. Supp. 735, 738 (S.D.N.Y. 1988) (similar).  If, however, "the carrier delivers the goods to a person not entitled to their possession," the carrier "is liable for damages."  49 U.S.C. § 80111(a)(1).  Thus, the common carrier "must deliver goods covered by a bill of lading on demand of . . . the holder of a negotiable bill for the goods," "[e]xcept to the extent a common carrier establishes an excuse provided for by law,"[17] *id.* § 80110(a)(1), and "delivery to a person not entitled to the goods without production of the bill of lading is prima facie a conversion of the goods and a breach of contract" under the Act.  *Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir. 1985) (internal quotation marks and brackets omitted).[18]

---

[17] As relevant here, one such exception to liability for "failure to deliver goods" under the Pomerene Act is if "the goods have been sold lawfully to satisfy the carrier's lien."  49 U.S.C. § 80111(d)(2).

[18] To be clear, the Amended Complaint does not assert a cause of action under the Pomerene Act.  Rather, Saray alleges a single cause of action under COGSA.  *See* Am. Compl. ¶ 1 ("This is an admiralty and maritime claim . . . brought under the United States Carriage of Goods by Sea Act . . . .").  With that said, "the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim," *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) (internal quotation marks omitted), so long as it gives "full notice of the circumstances giving rise to the plaintiff's claim for relief," *Morris v. Schroder Cap. Mgmt. Int'l*, 445 F.3d 525, 530 n.3 (2d Cir. 2006) (citation omitted).  Here, the Amended Complaint alleges that MTS "breached, failed and violated its duties and obligations as [a] common carrier" generally, Am Compl. ¶ 6, and such

Further, as noted above, the Court applies federal maritime common law when interpreting the relevant provisions in the Original Bills of Lading. *See supra* IV.A; *see also APL Co. Pte. Ltd. v. Kemira Water Sols., Inc.*, 890 F. Supp. 2d 360, 366 (S.D.N.Y. 2012) (looking to federal "common law principles of contract formation and interpretation" (internal quotation marks omitted)). In so doing, the Court is mindful that "contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Kirby*, 543 U.S. at 31. "The Court must 'construe contract language most strongly against its drafter,' but 'only . . . where the contract is ambiguous—where it is susceptible of two reasonable and practical interpretations.'" *MSC Mediterranean Shipping Co.*, 579 F. Supp. 3d at 493-94 (quoting *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 179 (2d Cir. 2014)).

## C.    Liability

As explained below, the Court makes three primary conclusions of law: *first*, Saray has standing to sue under the Merchant Clause of the Original Bills of Lading; *second*, any duty by MTS to Saray under COGSA (and/or the Pomerene Act) and/or the Original Bills of Lading ceased upon the Resin's return to the Port of Houston in accordance with the Redelivery Notice issued by U.S. Customs which constituted a valid restraint of princes; and *third*, regardless of whether MTS could be liable following the Resin's return to the Port of Houston, MTS's sale of the Resin to Polymerline was an exercise of a valid maritime lien against the Resin and recognized in the Original Bills of Lading. Thus, MTS is not liable to Saray. The Court further finds that Saray is liable to MTS for MTS's attorneys' fees in connection with its successful recovery from exercising the carrier's lien.

---

duties clearly arise under the Pomerene Act as well as COGSA. Accordingly, the Court will construe Saray's Amended Complaint as raising a claim under the Pomerene Act.

### 1.      The Merchant Clause

As the Court noted in its Opinion and Order on summary judgment, "an entity that falls under a Merchant Clause can sue on a bill of lading." *Saray*, 2021 WL 1199470, at *12-13; *see also, e.g.*, *Polo Ralph Lauren*, 215 F.3d at 1222-23; *All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1431-32 (9th Cir. 1993).  As the Court previously analyzed, the Original Bills of Lading contain a so-called "Merchant Clause" defining "Merchant" as "the shipper, consignee, receiver, holder of this Bill of Lading, owner of the cargo or person entitled to possession of the cargo and the servants and agents of any of these."  Terms and Conditions § 1(f).  The clause further provides that any "Merchant" "shall be jointly and severally liable to the Carrier [MTS] for the payment of all Charges, and for the performance of the obligations of any of them under this Bill of Lading."  *Id.*  By including such a broad Merchant Clause, the Original Bills of Lading clearly "intend[] to bind the 'owner' and the 'person entitled to possession' of the" Resin, and thus "[give] the owner or person entitled to the goods a right to sue under it." *Saray*, 2021 WL 1199470, at *13 (citing *Kirby*, 543 U.S. at 31).  However, at the time of summary judgment, Court was unable to determine, based on the disputed evidence then presented, whether Saray was the holder of the Original Bills of Lading and thus fell under their definition of "Merchant." *Id.* at *14-15.

That is no longer the case.  Having now assessed the evidence adduced at trial, the Court concludes that Saray is a "Merchant" under the Original Bills of Lading's Merchant Clause.  Fidan testified at trial that once MTS finalized the Original Bills of Lading, they were sent to Oxyde, and MTS did not retain any copies.  Tr. at 116:5-11.  Fidan also testified that MTS finished preparing the Original Bills of Lading around the time or shortly after the *Sealand New York* left Houston, which occurred on or around February 19, 2017.  *Id.* at 60:18-20, 115:25-116:4, 118:1-7.  Sarayli testified that Saray received the Original Bills of Lading from Oxyde via courier at the "end of

21

February," *id.* at 22:16-23:9, 99:5-15, 105:14-22; Sarayli Decl. ¶¶ 8-9, and that Saray has been in possession of the Original Bills of Lading ever since, Tr. at 22:21-25; Sarayli Decl. ¶ 10.

The Court has no reason to question Sarayli's testimony.  First, no other party has claimed possession of the Original Bills of Lading.  Second, Sarayli's testimony is consistent with other evidence in the record.  For example, when MTS first notified Oxyde of the Redelivery Notice, Oxyde's employees stated that the "full set of Original [Bills of Lading] are in Turkey" (where Saray is located) and that Oxyde would attempt "to locate the Original [Bills of Lading] and return them back to MTS."  Exh. 63 at 44.  Moreover, in June 2017, during MTS's negotiations with MSC, MTS informed MSC that Oxyde had reported it was "not able to get hold of Saray, the owners of this cargo," and that "they are the people who have to make the decision as to what to do with the shipment."  Exh. 62 at 37.  These statements are consistent with Oxyde having couriered the Original Bills of Lading to Saray because (1) Saray is located in Turkey and (2) given that these Bills of Lading were "negotiable" or "to order," their holder would have been entitled to take possession of the Resin upon delivery, and thus would be considered "the owners of the cargo" under the Original Bills of Lading.  Tr. at 126:11-18; *see also Ancile Inv. Co.*, 784 F. Supp. 2d at 309 n.7.  Accordingly, because Saray was and has been in possession of the Original Bills of Lading since the end of February 2017, it qualifies as a "Merchant" under the Merchant Clause and therefore may sue on the Original Bills of Lading.

### 2.    Restraint of Princes

As noted in the Court's Findings of Fact, pursuant to the Original Bills of Lading, MTS agreed to ship sixty-five containers of the Resin from Houston to Istanbul.  *See* Dkt. 184 at 23, ¶¶ 1, 5, 8.  That delivery, however, did not occur.  *Id.* ¶ 19.  Thus, Saray has established a *prima*

*facie* case for non-delivery under COGSA, *see Saray*, 2021 WL 1199470, at *15,[19] and the burden shifts to MTS to prove that it exercised due diligence or that non-delivery resulted from one of the excepted causes under COGSA.  *See Bally, Inc. v. M.V. Zim Am.*, 22 F.3d 65, 69 (2d Cir. 1994).

The Court concludes that MTS has established its entitlement to the "restraint of princes" defense to any liability under COGSA and similar provisions under the Original Bills of Lading for its failure to deliver the Resin.  COGSA provides that "[n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from . . . (g) [a]rrest or restraint of princes, rulers, or people, or seizure under legal process."  46 U.S.C. § 30701 note, § 4(2).  The defense "refers to a sovereign's exercise of its power controlling and divesting the dominion or authority of an owner over its ship."  *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 33 n.3 (2d Cir. 1986).  It covers "any forcible interference with the voyage or adventure at the hands of the constituted government, or ruling power of any country, whether done by it as an enemy of the State to which the ship belongs, or not."  *Lekas & Drivas, Inc. v. Goulandris*, 306 F.2d 426, 430 (2d Cir. 1962) (Friendly, J.).  "In order for the restraint of princes defense to shield a carrier from liability," however, "the restraint must be a proximate cause of the loss."  *Sedco*, 800 F.2d at 33.  Similarly, Clause 14(b) of the Terms and Conditions in the Original Bills of Lading states that MTS's "liability with respect to the Goods shall cease on the delivery or other disposition of the Goods in accordance with the orders or recommendations given by any government or authority of any person acting or purporting to act as or on behalf of such government or authority."  Terms and Conditions § 14(b).

Here, the evidence shows that U.S. Customs issued a Redelivery Notice for the Resin to MSC while the Resin was in the middle of its journey from Houston to Istanbul.  *See* Redelivery

---

[19] In addition, no party disputes that the Resin was delivered to MTS in good condition.

Notice; *see also* Tr. at 168:6-11; Fidan Aff. ¶ 22.  That Redelivery Notice "required [MSC] to redeliver the merchandise to U.S. Customs" for further "examination," noting that failure to do so could result in sanctions of "liquidated damages."  Redelivery Notice at 1; *see also* Fidan Aff. ¶ 22 (testifying that "Customs can assess a fine of three times the value of the cargo against the [vessel owning common carrier] if their order is not complied with").  Accordingly, MSC had no choice but to offload the Resin at Sines—the first relay point in its journey—and then arrange for the Resin to be reshipped back to Houston as quickly as possible.  Tr. at 130:12-14, 168:12-14; Fidan Aff. ¶ 22.  The Court therefore concludes that the Redelivery Notice was the only reason for (and therefore the proximate cause of) the Resin being redelivered to the Port of Houston on April 6, 2017.  *See* Fidan Aff. ¶ 24 ("The 65 containers were returned to the port of Houston on April 6th, 2017.").  Accordingly, the Redelivery Notice constitutes a restraint of princes under COGSA.

In reaching this conclusion, the Court rejects Saray's argument that the Redelivery Notice was insufficient to constitute a "seizure" or restraint by the United States government.  Dkt. 192 at 13:12-14:2.  At the final pretrial conference, Saray's counsel asserted that "these shipments were never seized by the government" because "the government never took custody or control" but rather eventually "released" the goods and  "allowed the goods to be delivered . . . per whatever arrangements were made privately."  *Id.*  But the Second Circuit has defined "restraint" broadly to encompass "*any forcible interference* with the voyage or adventure at the hands of the constituted government."  *Lekas & Drivas*, 306 F.2d at 430 (internal quotation marks omitted) (emphasis added).  The defense covers far more than permanent seizure or complete destruction of cargo by a government.  In fact, courts frequently find the defense applicable when goods are temporarily detained by a government's customs administration.  *See, e.g.*, *Transatlantic Marine Claims Agency, Inc. v. M/V Ever/Refine*, No. 96 Civ. 9141 (JSR), 1997 WL 603806, at *1-2 (S.D.N.Y.

Sept. 30, 1997) (holding that an order from U.S. Customs directing "the cargo moved . . . to a nearby bonded warehouse" for a period of less than a week "for the purpose of conducting a customs inspection" "satisfie[d] the 'restraint of princes' exception" under COGSA); *Benjamin v. M.V. Balder Eems*, 639 F. Supp. 1497, 1498-99 (S.D.N.Y. 1986) (finding the restraint of princes exception implicated when "the Dominican National Police, the Dominican Customs Service and the Dominican Port Authority, pursuant to a search warrant . . . opened the container and searched its contents for drugs" over the course of a single day); *see also Altrix Int'l, Inc. v. Seaboard Marine, Ltd. Inc.*, No. 93-2234-CIV-MARCUS, 1996 WL 870729, at *9 (S.D. Fla. Feb. 28, 1996) (assuming "that the United States Customs Service['s] . . . examination of the subject cargo and h[olding] the product at its facility . . . for more than a day" constituted a restraint).[20] That U.S. Customs directed the shipment to return to the United States, and subsequently delayed any future journey to Turkey by almost two months pending its documentation review, is more than sufficient to constitute a restraint of princes under COGSA.[21]

Saray further argues that "the focus here" should not be on "the redelivery order of [U.S. Customs], but rather, the choices MTS made after the cargo was released by customs and cleared for re-export." Saray Br. at 5. According to Saray, MTS's decision to sell the Resin to Polymerline

---

[20] In fact, in *Lekas & Drivas*, Judge Friendly held "[i]t cannot be disputed that the voyage . . . was affected by 'restraint of princes, rules, or people' under . . . COGSA" when an "order of the Greek Government" directed the carrier "to proceed via Suez and the Cape of Good Hope," as opposed to its original route, even though such order did not constitute any government seizure whatsoever. 306 F.2d at 430.

[21] For similar reasons, the Redelivery Notice also was an "order[] or recommendation[] given by any government or authority," thereby implicating Clause 14 of the Terms and Conditions to the Original Bills of Lading. Terms and Conditions § 14(b). Indeed, the language of Clause 14 arguably encompasses a broader swath of governmental actions, as it includes "recommendations" as well as "orders."

following its release from U.S. Customs was "an entirely unreasonable act, and thus an unreasonable deviation." Tr. at 10:25-11:1. This argument has many flaws.

First, to the extent Saray is arguing that MTS's sale constituted an "unreasonable deviation" in breach of the Original Bills of Lading and in violation of COGSA, *see Ataei*, 639 F. Supp. at 999-1000, neither the Original Bills of Lading nor COGSA continued to govern the parties' relationship following redelivery in Houston. Clause 14(b) states that "[t]he liability of the Carrier [*i.e.*, MTS] with respect to the Goods [*i.e.*, the Resin] shall cease *on the delivery or other disposition of the Goods* in accordance with the orders or recommendations given by any government or authority or any person acting or purporting to act as or on behalf of such government or authority." Terms and Conditions § 14(b) (emphasis added). The Redelivery Notice—*i.e.*, an "order[] . . . given by [the] government" of the United States—directed that the Resin be immediately redelivered to U.S. Customs at the Port of Houston for further inspection. Redelivery Notice. The Resin was redelivered to the Port of Houston in accordance with that order on April 6, 2017. Fidan Aff. ¶ 24. From that day forward, MTS's liability with respect to the Resin, including, for example, for any unreasonable deviation in shipment, "ceased" because that was the date on which MSC complied with the governmental order of redelivery. Furthermore, the Clause Paramount of the Original Bills of Lading states that "[t]he provisions of COGSA . . . shall govern before loading on and after discharge from the vessel and throughout the entire time the Goods or Containers or other packages are in the care, custody and/or control of the Carrier." Terms and Conditions § 4(a). Thus, COGSA ceased to apply after the Resin was returned to the Port of Houston for inspection by U.S. Customs, because that was the moment when the Resin was no longer in MTS's "care, custody and/or control."

26

Second, even if COGSA and the Original Bills of Lading somehow still governed the parties' relationship vis-à-vis the Resin following its release from U.S. Customs, the Redelivery Notice proximately caused MTS's sale of the Resin, and thus the sale is covered by the restraint of princes defense. *See Sedco*, 800 F.2d at 33.  "In admiralty the touchstone of proximate cause is foreseeability . . . ."  2 T. Schoenbaum, Admiralty & Mar. Law § 5:5 (6th ed. 2022); *accord Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839 (1996) ("In ruling upon whether a defendant's blameworthy act was sufficiently related to the resulting harm to warrant imposing liability for that harm on the defendant, courts sitting in admiralty may draw guidance from, *inter alia*, the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources."); *see also Petition of Kinsman Transit Co.*, 338 F.2d 708, 723-25 (2d Cir. 1964)  (noting that "[f]oreseeability of danger is necessary to render conduct negligent" under federal admiralty law, and that "when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity").  Here, the Court finds that the sale of the Resin was a foreseeable consequence of the Redelivery Notice.  From the moment U.S. Customs issued its Redelivery Notice, the Resin began incurring additional freight charges for its return journey from Sines to Houston.  Fidan Aff. ¶ 25.  In addition, it incurred $400 per container in detention and demurrage charges for each day of the roughly two months that it sat on the dock at the Port of Houston pending inspection by U.S. Customs.  Fidan Aff. ¶ 28; Tr. at 124:6-15.  These fees accrued on the Resin itself, thereby decreasing its value each day.  *See* Tr. at 176:18-21 (Fidan testifying that "if the cost on the cargo rises, the difference between the cargo value and the cost of the cargo will . . . get smaller and smaller so the value of the cargo goes down").  In fact, by June 5, 2017—shortly before its release—the Resin had already incurred fees equal to roughly 98% of its original purchase price: $1,268,150 in fees in comparison to the $1,297,500 which Saray

initially paid.  *See* Exh. 36; Fidan Aff. ¶ 28.  Thus, it is foreseeable that someone would attempt to sell the Resin to recoup those losses stemming from the delay caused by the Redelivery Notice rather than pay more money to reship the Resin to Turkey.

Third, MTS's sale of the Resin was not only a valid exercise of its carrier's lien under the Original Bills of Lading, *see infra* IV.C.3, but also an entirely reasonable decision.  Clause 14 of the Terms and Conditions states following "delivery or other disposition of the Goods in accordance with the orders or recommendations given by any government or authority," "the Carrier [*i.e.*, MTS] shall be entitled to full Charges on Goods received for Carriage and the Merchant shall pay any additional costs resulting from the above mentioned circumstances"—*i.e.*, the restraint of princes.  Terms and Conditions § 14.  As the Court previously concluded, Saray was a "Merchant" at this time since Saray was contemporaneously in possession of the Original Bills of Lading.  *See supra* IV.C.1.  Saray was thus responsible for all "Charges"—"freight, deadfreight, demurrage, and all expenses and money obligations incurred," Terms and Conditions § 1(c), including those associated with the redelivery, *id.* § 14(c).  Saray even admitted as much at trial.  *See* Tr. at 45:10-46:5, 65:16-66:10; *see also* Sarayli Decl. ¶ 22.  Yet when it came time to pay those fees, Saray was nowhere to be found despite claiming to have hired a lawyer to investigate the redelivery, Tr. at 87:25-88:17, despite claiming to have been aware of the daily-incurring fees, *id.* at 87:17-20, and despite MTS's repeated attempts to notify Saray of said charges, Fidan Aff. ¶ 36; Exhs. 65-67, 69 at 3; Tr. at 129:1-10, 130:15-17, 131:12-14.  Because MTS was left holding the bag, its only options were to allow the Resin to pass to the General Order, in which case it would continue accruing increased daily demurrage and detention fees and ultimately be sold at auction at a discounted price, or to pay the negotiated fees itself, take possession of the Resin, move it to a cheaper warehouse, and sell it at a profit over the charges it paid to MSC.  The

latter is the obvious choice, and Saray does not provide any basis for why it would have been more reasonable for MTS to have acted otherwise. Accordingly, even if COGSA and the Original Bills of Lading still governed the parties' relationship following redelivery of the Resin, MTS's decision to sell the Resin was a direct, a proximate, and an entirely reasonable result of the Resin being detained and Saray's failure to pay the fees associated with that detention.

Finally, the Court notes that Saray has failed to prove that MTS's negligence caused the restraint of princes—the Redelivery Notice. *See French Overseas Corp.*, 277 U.S. at 334. Neither party called any witnesses from U.S. Customs, Oxyde, or MSC—the entities that may have had direct knowledge of the reason for the Redelivery Notice. *See* Fidan Aff. ¶ 29 ("As far as we know, during those two months after the cargo came back to Houston, U.S. Customs was dealing with both MSC and Oxyde during their investigation."). The only trial evidence providing any indication as to why U.S. Customs demanded redelivery of the Resin is an email between Officer Cruz and Oxyde in which Cruz stated that the "[s]hipment is under document review and further inspection." Exh. 84 at Oxyde000028. Saray points to what it characterizes as "an abundance of evidence that a number of prior MTS shipments, unrelated to Saray, were also recalled by CPB." Saray Br. at 4. But even if MTS had caused redeliveries in the past, Fidan testified that MTS was not responsible for preparing any of the customs documentation for the Resin. Tr. at 114:8-24; Fidan Aff. ¶¶ 19-20. Thus, because "documentation review" is the only reason in the record concerning the redelivery of the Resin, there is no evidentiary basis to find MTS responsible for the redelivery since it did not prepare the documentation.

Accordingly, Saray has failed to prove that MTS is liable under COGSA[22] and/or the Original Bills of Lading.

### 3.    The Carrier's Lien

The Court's determination that MTS has a valid defense to any liability could end its liability analysis in favor of MTS.  However, because it is relevant to the Court's determination of MTS's entitlement to attorneys' fees and because both parties address the issue, the Court will also rule on the validity of MTS's sale of the Resin.  *See* Saray Br. at 5; MTS Br. at 10-12.  The Court concludes that MTS possessed a valid lien on the Resin under federal maritime law, and MTS's sale of the Resin to Polymerline was a proper exercise of that lien.

"A maritime lien is a privileged claim upon maritime property, such as a vessel, arising out of services rendered to or injuries caused by that property."  *In re World Imports Ltd.*, 820 F.3d 576, 583 (3d Cir. 2016) (citation omitted).  "For centuries, courts have held that people who own and operate a vessel have a lien on the cargo transported on their ships."  *Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena*, 86 F.3d 908, 913 (9th Cir. 1996); *see also Arochem Corp. v. Wilomi, Inc.*, 962 F.2d 496, 499 (5th Cir. 1992) (similar); *The Bird of Paradise*, 72 U.S. (5 Wall.) 545, 555

---

[22] The Court's conclusion that the restraint of princes defense shields MTS from COGSA liability applies equally to any liability under the Pomerene Act.  The Pomerene Act provides, in relevant part:  "*Except to the extent a common carrier establishes an excuse provided by law*, the carrier must deliver goods . . . ."  49 U.S.C. § 80110(a) (emphasis added).  Thus, the duty to deliver goods under the Pomerene Act is subject to any defenses "provided by law," and the "restraint of princes" is a valid defense under COGSA.  *See* 46 U.S.C. § 30701 note, § 4(2)(g).  Moreover, the Pomerene Act holds that "[a] common carrier is not liable for failure to deliver goods to the consignee or owner of the goods or a holder of a bill if," *inter alia*, "the goods have been sold lawfully to satisfy the carrier's lien" or "the goods have not been claimed."  49 U.S.C. § 80111(d).  As discussed *infra* IV.C.3, MTS's sale of the Resin was a "lawful[]" exercise of a valid carrier's lien.  And as also discussed *supra*, at the time the Resin was released from the custody of U.S. Customs, Saray was nowhere to be found and did not come forward with the Original Bills of Lading to claim the Resin.  Accordingly, there can be no liability for MTS under the Pomerene Act.

(1886) ("Legal effect of such a lien is, that the ship-owner, as carrier by water, may retain the goods until the freight is paid, or he may enforce the same by a proceeding *in rem* in the District Court."); *In re 4,885 Bags of Linseed*, 66 U.S. (1 Black) 108, 113 (1861) ("The lien of the carrier by water for his freight, under the ordinary bill of lading, although it is maritime, yet it stands upon the same ground with the carrier by land, and arises from his right to retain possession until the freight is paid . . . ."). This right applies equally to NVOCCs, like MTS. *See, e.g.*, *Logistics Mgmt.*, 86 F.3d at 914 ("NVOCCs have an *in rem* maritime lien for unpaid freight against the cargo that they are responsible for transporting.").

Courts have also long endorsed the parties' ability to provide for such a lien by contract. *See, e.g.*, *In re World Imports Ltd.*, 820 F.3d at 583 ("[L]iens on cargo may arise out of contracts to pay freight."); *Logistics Mgmt.*, 86 F.3d at 914 ("Contractual provisions regarding liens on cargo for freight are enforceable in admiralty."); *The Bird of Paradise*, 72 U.S. at 555 ("Parties . . . may frame their contract of affreightment as they please, and of course may employ words to affirm the existence of the maritime lien, or to extend or modify it. . . .   [A]nd where they so agree, the settled rule in this court is, that the law will uphold the agreement and support the lien."). Moreover, under the Pomerene Act,

> [a] common carrier issuing a negotiable bill of lading[23] has a lien on the goods covered by the bill for
>
> > (1) charges for storage, transportation, and delivery (including demurrage and terminal charges), and expenses . . . incidental to transporting the goods after the date of the bill; and
> >
> > (2) other charges for which the bill expressly specifies a lien is claimed to the extent the charges are allowed by law and the agreement between the consignor and carrier.

---

[23] As noted, the Original Bills of Lading are negotiable bills of lading.  Fidan Aff. ¶ 10; Tr. at 126:11-18.

49 U.S.C. § 80109.

Maritime liens typically attach from the moment the cargo is loaded onto the ship.  *See Osaka Shosen Kaisha v. Pac. Exp. Lumber Co.*, 260 U.S. 490, 499-500 (1923) ("[T]he obligation between a ship and cargo is mutual and reciprocal and does not attach until the cargo is on board or in the master's custody.").  And because the lien is "possessory in nature, . . . it is ordinarily lost by *unconditional* delivery of the cargo."  *Arochem Corp.*, 962 F.2d at 499-500 (emphasis in original); *see also In re World Imports Ltd.*, 820 F.3d at 584 ("A lien for unpaid freight 'arises from the right of the ship-owner to retain the possession of the goods until the freight is paid,' and thus is lost upon 'unconditional delivery to the consignee.'" (quoting *The Bird of Paradise*, 72 U.S. at 555)).  "The parties to the transaction, however, may agree that the lien survives beyond discharge."  *Arochem Corp.*, 962 F.2d at 500; *see also The Eddy*, 72 U.S. (5 Wall.) 481, 495-96 (1866) ("Parties may agree that the goods shall be deposited in the warehouse of the consignee or . . . owner, and that the transfer and deposit shall not be regarded as a waiver of the lien, and where they so agree the courts of admiralty will uphold the agreement and support the lien . . . .").  In fact, "because it would frustrate commerce to require shipowners to retain their liens only by actual possession of the impacted cargo, a shipowner enjoys a strong presumption that, absent a clear indication to the contrary, he has not waived his cargo lien upon delivery of that cargo."  *In re World Imports Ltd.*, 820 F.3d at 584 (footnotes omitted); *see also N.H. Shipping Corp. v. Freights of the S/S Jackie Hause*, 181 F. Supp. 165, 169 (S.D.N.Y. 1960) ("The right of the vessel [to a cargo lien] is so strong in the eyes of the admiralty that it will only be considered relinquished by the most unequivocal and express terms or the most absolute and unconditional surrender." (citing *The Bird of Paradise*, 72 U.S. at 545)).

In this case, the Original Bills of Lading provide for a "Carrier's Lien" in Clause 17.  That

Clause states

> The Carrier shall have a lien on the Goods, inclusive of any Container owned or
> leased by the Merchant, as well as on any Charges due any other person, and any
> documents relating thereto, which lien shall survive delivery, for all sums due under
> this contract or any other contract or undertaking to which the Merchant was a party
> or otherwise involved, including, but not limited to, General Average contributions,
> salvage and the cost of recovering such sums, inclusive of attorney fees.  Such lien
> may be enforced by the Carrier by public or private sale at the expense of and
> without notice to the Merchant.  The Merchant agrees to defend, indemnify, and
> hold the Carrier . . . harmless from and against all liability, loss, damage or expense
> which may be sustained or incurred by the Carrier relative to the above . . . .

Terms and Conditions § 17.  Thus, the Original Bills of Lading recognize that MTS (the "Carrier")

had a lien on the Resin (the "Goods") for the return freight and detention and demurrage fees (the

"Charges"[24]) due to MSC ("any other person").  That lien attached on February 10, 2017—the day

the Resin was loaded onto the *Sealand New York*.  Fidan Aff. ¶¶ 15-17.  Moreover, to the extent

redelivery of the Resin to the Port of Houston on April 6, 2017 constituted "delivery" for the

purposes of the maritime lien analysis, the Original Bills of Lading provide that the carrier's lien

"shall survive delivery."  Terms and Conditions § 17.  And finally, while maritime liens are

typically enforced through *in rem* actions against the cargo or *in personam* actions against the

shipper, *see* Schoenbaum, *supra*, § 9:1, here, the Original Bills of Lading provide that the lien

"may be enforced by the Carrier by public or private sale at the expense of and without notice to

the Merchant."  Terms and Conditions § 17.  Even so, counsel for MTS sent two formal letters

announcing its intent to exercise a maritime lien, *see* Exhs. 68, 69, and the second letter explicitly

---

[24]  *See* Terms and Conditions §§ 1(c) (defining "Charges" as "freight, deadfreight,
demurrage and all expenses and money obligations incurred and payable bay the Merchant");
14(b)-(c) (stating that upon "delivery or other disposition of the Goods in accordance with the
orders or recommendations given by any government or authority[,] . . . . the Merchant shall pay
any additional costs resulting from the above mentioned circumstances").

requested that Oxyde "forward this letter-notice to the person or entity claiming ownership of the shipment," Exh. 69.  And MTS only sold the Resin after being authorized to do so by order of Judge Atlas.  Dkt. 23 at 1; Fidan Aff. ¶ 41.  Because Judge Atlas's order expressly noted "that all rights are reserved for Saray to pursue any and all claims related to the return of the $820,000.00 against MTS or any other party," Dkt. 23, it logically follows (and would only seem fair) that MTS would be able to assert its maritime lien as a defense to such claims, *see Johnson Prods. Co. v. M/V La Molinera*, 628 F. Supp. 1240, 1248 (S.D.N.Y 1986) (dismissing claim for damages against a defendant who "properly exercised its lien for unpaid freight on the shipment").  Thus, the Court finds that MTS possessed a valid lien on the Resin under federal maritime law, as recognized in the Original Bills of Lading, and that it properly exercised that lien.

Saray's only argument to the contrary is that "MTS would have in fact had a proper lien if it had actually delivered the cargo to Istanbul, then they would have a lien," but that "[h]aving the cargo returned to Houston for seven months and then selling it, not a proper lien."  Tr. at 38:16-19; *see also* Saray Br. at 5.  But this is contrary to law because, as discussed above, a carrier typically *loses* its lien (rather than the lien attaching) upon unconditional delivery of the cargo. *See In re World Imports Ltd.*, 820 F.3d at 584; *Arochem Corp.*, 962 F.2d at 499-500; *The Bird of Paradise*, 72 U.S. at 555.  Moreover, as noted above, MTS's lien attached when the Resin was loaded onto the *Sealand New York*, and survived redelivery to the Port of Houston per the terms of the Original Bills of Lading.  *See The Eddy*, 72 U.S. at 495-96.

Thus, because MTS possessed a carrier's lien on the Resin and its sale of the Resin to Polymerline was a valid exercise of that lien, MTS is not liable to Saray for its sale of the Resin.

D.      **Attorneys' Fees**

Having determined that judgment should be entered in favor of MTS, the Court now turns to MTS's claim for attorneys' fees.  *See* Dkt. 74.  MTS argues that such fees are warranted under the language of Clause 17 of the Terms and Conditions of the Original Bills of Lading.  Dkt. 185 ¶ 59; MTS Br. at 6.  Saray does not appear to dispute this.  *See* Saray Br. at 2.

"Under the bedrock principle known as the American Rule, each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) (internal quotation marks and brackets omitted).  In that vein, "[t]he general rule in admiralty is that attorneys' fees are not recoverable by the prevailing party." *Genesis Marine, L.L.C. of Del. v. Hornbeck Offshore Servs., L.L.C.*, 951 F.3d 629, 631 (5th Cir. 2020) (internal quotation marks omitted).  "In keeping with the basic tenets of contract law," however, "attorney fees and costs may be awarded where the bill of lading provides for the award of attorney fees." *OOCL (USA) Inc. v. Transco Shipping Corp.*, No. 13 Civ. 5418 (RJS), 2015 WL 9460565, at *7 (S.D.N.Y. Dec. 23, 2015) (internal quotation marks omitted).

In this case, Clause 17 in the Original Bills of Lading states that the carrier's lien applies to "all sums due under this contract or any other contract or undertaking to which the Merchant was a party or otherwise involved, including . . . the costs of recovering such sums, inclusive of attorney fees."  Terms and Conditions § 17.  Thus, the parties clearly expanded the scope of the general maritime lien to include the costs to MTS of successfully invoking the terms of the Bill of Lading, such as attorneys' fees to enforce the carrier's lien over unpaid charges.  Clause 17 goes on to state that "[t]he Merchant agrees to defend, indemnify, and hold the Carrier . . . harmless from and against all liability, loss, damage or expense which may be sustained or incurred by the Carrier relative to the above."  *Id.*  As such, Saray (the Merchant) has a duty to "indemnify"—*i.e.*,

reimburse—MTS for its attorneys' fees because such fees are included in the "expense which [MTS] sustained or incurred . . . relative to" its enforcement of the carrier's lien. *See Chevron Oronite Co. v. Jacobs Field Servs. N. Am., Inc.*, 951 F.3d 219, 231 (5th Cir. 2020) ("In federal maritime cases, . . . the duty to indemnify and hold harmless includes costs and attorney's fees." (internal quotation marks and brackets omitted)); *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 374 F. App'x 119, 123 (2d Cir. 2010) ("[T]he parties' intention to indemnify attorneys' fees is unmistakably clear from language stating that E\*TRADE 'shall be indemnified and held harmless by the Seller . . . .'"). Accordingly, the Court finds that MTS is entitled to attorneys' fees under Clause 17 of the Terms and Conditions in the Original Bills of Lading.

That said, the only reference to attorneys' fees in the Original Bills of Lading appears in that carrier's lien clause. This indicates two things. First, the proper method for MTS to obtain reimbursement for attorneys' fees is by exercising its carrier's lien. As discussed previously, MTS's sale of the Resin was a valid exercise of this lien. *See supra* IV.C.3. Second, the amount of attorneys' fees that MTS is able to recover is limited to whatever it can obtain by exercising its carrier's lien. As noted in the Court's Findings of Fact, MTS sold the Resin to Polymerline at a price of $820 per metric ton, for a net amount of $1,238,528. Fidan Aff. ¶ 41; Tr. at 139:5-20; Exh. 27. MTS, however, used $846,590.54 to reimburse itself for other expenses—the detention and demurrage fees and return freight. Fidan Aff. ¶¶ 42-43; Tr. at 140:7-21. That sum was already used for a valid purpose under the carrier's lien clause, and so it cannot also be used for attorneys' fees. In other words, the amount MTS may recover in attorneys' fees for MTS is limited to the $344,310 surplus from the sale of the Resin. *See* Fidan Aff. ¶ 43; *see also supra* n.16.

Furthermore, those fees shall not include anything attributable to an unsuccessful litigation strategy in this or related litigation. *See S.E.C. v. Yorkville Advisors, LLC*, No. 12 Civ. 7728 (GBD)

(HBP), 2015 WL 855796, at *12 (S.D.N.Y. Feb. 27, 2015) ("Courts may reduce fee applications for time spent on unsuccessful arguments."). *But see Rozell v. Ross-Holst*, 576 F. Supp. 2d at 527, 538 (S.D.N.Y. 2008) ("[A] court should not disallow fees for every motion that a prevailing party did not win."). Thus, MTS may not recover any fees incurred in prosecuting its unsuccessful motion for summary judgment. Nor may MTS recover fees for bringing its counterclaim for unjust enrichment which it has since abandoned, or any fees related to *MTS Logistics Inc. v. Saray Dokum ve Madeni Aksam Sanayi Turizm A.S.*, No. 21 Civ. 4016 (JPC) (S.D.N.Y.)—the related action that MTS initiated on May 5, 2021.

The Court orders the parties to meet and confer to attempt to reach an agreement on the amount of MTS's attorneys' fees that fall within these parameters, and only if agreement cannot be reached will the Court conduct another conference and/or schedule additional submissions. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, Nos. 14 Md. 2452 (VSB) (SLC), 21 Civ. 7504 (VSB), 2023 WL 3304287, at *12 (S.D.N.Y. May 8, 2023) (directing the same).

## V.  Conclusion

For the foregoing reasons, MTS is not liable to Saray under COGSA, the Pomerene Act, or general maritime law. The Court awards MTS attorneys' fees in an amount to be determined. The parties shall meet and confer to attempt to reach an agreement on MTS's attorneys' fees consistent within the findings in *supra* IV.D. If an agreement is reached, by August 21, 2023, the parties shall submit a joint stipulation as to the amount of MTS's attorney's fees. If negotiations

are unsuccessful, by August 21, 2023, the parties shall each file a letter setting forth their positions

on the appropriate sum of MTS's attorneys' fees.

   SO ORDERED.

Dated: August 11, 2023
   New York, New York

              JOHN P. CRONAN
           United States District Judge